59 So.2d 664

**LOUISVILLE & N. R. CO. v. STEEL.**

**6 Div. 222.**

Supreme Court of Alabama.
May 15, 1952.

Rehearing Denied June 26, 1952.

Chas. H. Eyster, Decatur, and Gibson &
Gibson, Birmingham, for appellant.

J. Robert Huie and Jackson, Rives, Pettus & Peterson, all of Birmingham, for appellee.

STAKELY, Justice.

This is a suit instituted by John Steel (appellee) against the Louisville & Nashville Railroad Company (appellant) under the Federal Employers' Liability Act, 45 U.S.C.A. § 151 et seq., for damages alleged to have been suffered on January 28, 1949, while shoveling sand in a boxcar sand house of the railroad company. It is claimed that his left foot slipped out from under him because of a wet and slick steel floor in the boxcar causing him to fall down on his right knee, his back striking against the door of the boxcar, from which he sustained his injuries.

The case was tried on Counts A and B. In Count A it is alleged that the plaintiff was caused to suffer said injuries "as a proximate consequence of the negligence of the defendant in negligently failing to exercise reasonable care to furnish plaintiff with a reasonably safe place to work, in that while in shoveling of sand in said Sand House, the Plaintiff was required to stand and move about on a piece of sheet metal which was slick and slanted so as to be unlevel."

Count B is substantially similar to Count A except as follows: "Plaintiff avers that he was caused to fall in said Sand House of the defendant and to suffer the aforesaid injuries and damages as a proximate consequence of the negligence of the defendant.

in negligently failing to exercise reasonable care to furnish plaintiff with a reasonably safe place to work in that the defendant or servants, agents or employees of the defendant, while working within the line and scope of their employment by the defendant, negligently caused or negligently allowed the door and window of said Sand House to be and remain open while it was raining so that the floor of said Sand House, which consisted of a piece of smooth sheet metal, and which was slanted so as to be unlevel, was caused to become wet and slippery."

To the foregoing counts the defendant pleaded the general issue and also certain special pleas, alleging in substance a compromise and settlement of the claim sued on with full release of the defendant. These special pleas and the defense sought to be made thereunder will be hereinafter referred to at greater length.

Upon the trial of the cause the jury returned a verdict in favor of the plaintiff in the sum of $5,000 upon which the court rendered judgment in favor of the plaintiff and against the defendant. The court further rendered judgment on the plaintiff's plea of tender of $250 to be credited upon the judgment in favor of the plaintiff. This credit will be hereinafter referred to at greater length. There was a motion for a new trial which was overruled by the court.

I. It is insisted that the defendant was entitled to the affirmative charge which it requested and which the court declined to give, the insistence being based on failure of the plaintiff to prove the allegations of his complaint. It is the position of appellant that the evidence in the case did not present a question for determination by the jury as to whether the defendant had used reasonable care to furnish plaintiff with a reasonably safe place to perform the duties of his employment by the defendant. The defendant had a sand house in its yard at 14th Street in the City of Birmingham for the purpose of drying sand to be used on locomotive engines. After the sand had been dried, it would be transferred from the sand house directly into the engines so that the engines when used on the road could put the sand on the rails to keep from slipping.

The sand house in question was an old boxcar which had been converted into a sand house. It was situated on railroad ties or wooden sills which had just about rotted out. The sand house was 36 feet long, 9 feet wide and 8 feet high with the sliding door 6 feet wide and 7 feet high open on the side and with windows in it at each end of about 20 x 24 inches.

Wet sand was kept in one end of the boxcar and dry sand in the other end. In the middle of the boxcar at the back side and opposite the door there was a large stove with a screen and netting around it. This was called the "dryer". Sand was shoveled into this dryer and as it dried out, it fell on the floor. The dry sand was then shoveled against a double screen, one with large mesh and one with fine mesh. After the sand passed through the second screen it fell on the floor and the cinders and pebbles and rock that were in the sand went into a drain. The fine sand was then shoveled into a bin or drum and from this bin or drum was delivered to engines on a track next to the sand house.

The ground on the front side of the sand house was 3 or 4 feet higher than the ground to the rear or opposite side of the car. The boxcar had been used as a sand house for a number of years. It had been in such use and situated in the same manner on wooden ties or sills for several years prior to the time the plaintiff claims to have been injured. The plaintiff is alleged to have been injured in January, 1949. There was proof tending to show that the sills or ties would cause the back end of the sand house to "lay down". The floor of the sand house at the point where the plaintiff was required to work and stand while in the performance of his duties in the sand house was covered by a plate of sheet metal. This same piece of sheet metal had been in use in the sand house for at least six years. During that time it had been the custom and practice to shovel sand from it. The metal covering on the floor was variously described as "slick", "shiney as a dime", "slippery as glass" and "slick by the stove". The slick or slippery metal

was unlevel, slanting back to the rear of the sand house opposite the door. It slanted back from the door on under the stove of the dryer 1½ to 2 inches, being higher in front of the stove than it was in the back.

Tendencies of the evidence show the following. On the day of his injuries plaintiff went to his work about 3 P.M. It was raining when he got out to go to work. It was raining when he reached the sand house. He found that the door to the sand house and the two windows had been left open and the sand and floor of the sand house were wet. There was testimony tending to show that a piece of metal like the one on the floor of the boxcar was more slippery when wet than when dry. It was the custom and practice when a crew went off duty from the sand house and it was raining or rainy weather to close the windows and it was important to the defendant to keep the sand dry. Men working in the sand house have instructions from the company to keep the door and windows of the sand house closed in order to keep the rain out and it was the custom and practice among the employees working in the sand house to keep the door shut when it was raining. On reporting to the sand house with another employee named Hadnot, it was noticed that the door had been left open and finding the floor and sand wet, plaintiff closed the door and windows.

According to the testimony of the plaintiff, after he entered the sand house every time he stepped on the metal covering the floor the water would "gush up" under the floor, the floor being rotten. The floor where plaintiff fell was wet and slippery as glass. Plaintiff had tried to dry the floor with the dry sand, but because the water "kept running back on it, he could not keep it dry".

When plaintiff fell he struck his back on the door facing and threw his shovel against the sand bin in an effort to break his fall. He felt "dizziefied" and felt pain in the small part of his back and both legs and became sick. He was taken by his fellow employee Hadnot over to Mr. Vanderhurt, "the lead machinist", and the accident was reported. His boss a Mr. Cook came up and took him in a car to the office of Dr. Wilson, the company doctor.

The basis of liability under the Federal Employers' Liability Act is negligence and negligence on the part of the employer is not presumed. Negligence must be inferred from a reasonable and fair interpretation of the evidence. Furthermore to sustain the claim of negligence under the act, the claim must be supported by proof of a substantial nature and not a mere scintilla. Louisville & N. R. Co. v. Green, 255 Ala. 642, 53 So.2d 358.

Without doubt the employer owes the duty of furnishing the employee with a reasonably safe place to perform his work and this principle has been recognized in cases arising under the Federal Employers' Liability Act. Bailey v. Central Vermont R. Co., 319 U.S. 350, 63 S.Ct. 1062, 87 L.Ed. 1444.

In applying the foregoing principles under the Federal Employers' Liability Act, the Supreme Court of the United States has been outspoken and of course its decisions control. The Supreme Court of the United States has decided that the trial court is not justified in taking the case from the jury and directing a verdict for the defendant except where there is a complete absence of probative facts to support the plaintiff's claim of negligence on the part of the railroad. Lavender v. Kurn, 327 U.S. 645, 66 S.Ct. 740, 90 L.Ed. 916; Tennant v. Peoria & P. U. R. Co., 321 U.S. 29, 64 S.Ct. 409, 88 L.Ed. 520; Bailey v. Central Vermont R. Co., 319 U.S. 350, 63 S.Ct. 1062, 87 L.Ed. 1444; Tiller v. Atlantic Coast Line R. Co., 318 U.S. 54, 63 S.Ct. 444, 87 L.Ed. 610; Wilkerson v. McCarthy, 336 U.S. 53, 69 S.Ct. 413, 93 L.Ed. 497.

Under the controlling authorities the case at bar presents a question for the jury as to whether or not under all the circumstances the defendant exercised reasonable care to furnish the plaintiff with a reasonably safe place to work. The evidence tends to show that the place where plaintiff performed his services was on an unlevel, slanting floor covered by a slick piece of sheet metal. Beyond this tendencies of the evidence showed that the place where

plaintiff worked at the time of the accident was negligently allowed to become wet and "slippery as glass". According to tendencies of evidence the plaintiff was not provided a place to work where he was afforded safe and secure footing. The physical movements necessary on his part incident to shoveling and moving the sand while standing on the footing which has been described was such as to invite his fall. There was accordingly no error in refusing to give the general affirmative charge for the defendant as to Counts A and B of the complaint.

II. It is further argued that the defendant was entitled to the general affirmative charge under its pleas of settlement and release. The plaintiff filed a replication to the pleas, alleging in substance that his signature to the release was procured by fraudulent misrepresentation of its contents and that he, being unable to read and relying on such misrepresentations, signed the release not knowing that it was an instrument releasing the railroad from liability for injuries suffered by him. It is true that the plaintiff signed the release on April 17, 1950 and the effect of the release is to constitute a settlement of the claim sued on in this case. But we consider that there is substantial evidence in support of the plaintiff's replication that the release was obtained by the railroad's claim agent through fraudulent misrepresentations as to the contents of the release.

The plaintiff is a 41 year old Negro laborer, born in Marengo County, Alabama, and having only 4 or 5 months of schooling. On the other hand the claim agent of the railroad is an intelligent, well educated white man, experienced and trained in the business of negotiating the settlement of claims against the company. In fact, negotiation of settlements and procurement of releases is the business for which he is employed by the company. On March 10, 1949, according to the plaintiff, he informed the claim agent that he could not read at the time the claim agent took a statement of the accident. At the bottom of the statement the following words appear: "I have heard the above statement read and it is true." The same statement appears at the bottom of the statement taken by the claim agent from the plaintiff on August 25, 1949. The claim agent admitted that it was customary for him in taking statements from witnesses and claimants to have them read the statement before signing it, but that plaintiff requested him to read these statements to him. According to the plaintiff the statements were read to him by the claim agent because he (plaintiff) informed him that he could not read. The claim agent testified that the company required him when taking releases from claimants to place at the bottom of the release just above the signature the words, "I have read and understand this release." It is to be observed that both statements obtained from plaintiff by the claim agent disclose that the statements were not read by plaintiff but that they were read to him by the claim agent, yet the release shows in accordance with the company's instructions to the claim agent that the plaintiff had read it. The statement obtained in August, 1949, originally contained the words, "I have read the above statement and it is true", but that as the claim agent testified, he wrote in the word "heard" between the word "have" and the word "the", so that at the time it was actually signed by the plaintiff it read, "I have heard the above statement read and it is true". It is a reasonable inference that if the plaintiff could have read the statement the claim agent would have had him do so and would not have inserted the word "heard", in order to show the true facts.

According to the plaintiff there was discussion between him and the claim agent with reference to money received by plaintiff from the Railroad Retirement Board while he was off from work as a result of his injuries and with reference to the reimbursement of the Railroad Retirement Board fund out of the ½ of the plaintiff's lost time that appellant was to pay him. Title 45 U.S.C.A. § 362(o). According to plaintiff the claim agent told him that he would have to sign an affidavit or a paper which would allow the railroad to withhold

from the payment of ½ of plaintiff's lost time the sum of $200 he had drawn from the Railroad Retirement Board. The full amount of plaintiff's ½ of lost time aggregated $250. According to plaintiff the claim agent told him, "you will have to sign a release for me to turn that money over to the Board to pay them that $200.00 back." According to the plaintiff he relied on the statements of the claim agent with reference to the necessity of him signing the paper in order to release the money to the Railroad Retirement Board and that the claim agent at no time told him that he was signing a release which would release the railroad of its liability to plaintiff on account of his injuries. In addition to signing the release plaintiff received a check for $50.

The appellant stresses the fact that the plaintiff reported for work regularly and that the shifts are posted on the bulletin board, indicating that the plaintiff can read. According to the claim agent when the plaintiff missed work on one shift, the plaintiff told him that he didn't see his name on the bulletin board. The plaintiff went over to the bulletin board to look at it and he, the plaintiff, "put his finger on the first 'J' and he said he did not see that 'J'." It is a fair inference that if the plaintiff could in fact read, there would have been no occasion for him to point to the letter "J" and say he did not see it. Admittedly the claim agent read the two statements, which have been referred to, to the plaintiff, but tendencies of evidence show that he failed to read to him the vital paper here involved, the so-called release. Under tendencies of the evidence it seems clear that there was presented a question for the jury as to whether or not the plaintiff was induced to sign the release by the fraudulent misrepresentations of the claim agent as to its contents. Cooper v. Agee, 222 Ala. 334, 132 So. 173; Illinois Central R. Co. v. Johnston, 205 Ala. 1, 87 So. 866.

III. The court overruled appellant's objection to the following question asked the actuary, Mr. Kirkpatrick, "I will ask you if you can give us the life expectancy of a negro man employed as a laborer in a railroad yard who was born on December 14, 1908?" The appellant takes the position that there was nothing in the evidence which allowed a reasonable inference that the plaintiff's life expectancy would be reduced as the result of the injuries of January 29, 1949. The question, however, is designed to adjust the standard mortality table to take care of the additional mortality which is experienced among Negroes in connection with the occupational hazard involved in this case. Furthermore, while the question was not raised by the objection, it seems to us that the life expectancy was being inquired about as of the date the question was asked, namely; the date of the trial of the case.

IV. There are assignments of error based upon the overruling by the court of objections to a number of questions propounded to the actuary with reference to the amount of money invested at various rates of interest which would produce an income of $100 per month during the life expectancy of 22.01 years of the plaintiff, as shown by the testimony of the actuary, so that at the end of the life expectancy the entire principal and earned interest would be consumed at the rate of $100 per month over the period of the life expectancy. The figures given by the actuary in his replies are based upon an income of $100 per month. According to the actuary if the calculations are on a basis of an income of $200 per month, each figure would be twice as great and if the monthly income was $50 per month, the figures would be divided by two. Other monthly incomes would be proportionate. In other words the basis of a pecuniary loss of $100 per month was used so that it could be easily increased or decreased depending on the jury's finding of the extent of the plaintiff's loss of earning power. At the time he was injured the plaintiff was earning about $200 per month.

One of the elements of damages recoverable by the plaintiff under the Federal Employers' Liability Act is the loss

or impairment of plaintiff's earning power. The admissibility of mortality tables showing plaintiff's life expectancy and the admissibility of expert testimony to show the present value of any loss sustained is recognized. This court has held that where there is evidence from which there is a reasonable inference that a plaintiff's injuries are permanent, the mortality tables are admissible. Southern R. Co. v. Cunningham, 152 Ala. 147, 44 So. 658. Furthermore the plaintiff is not precluded from recovery for impairment of his earning power by reason of injuries sustained by him because he returned to work in October 1949 and worked up until the time of the trial in December 1950. It is held that wages actually earned by a person and his earning power are not identical. The fact that the plaintiff worked for appellant for several months prior to the trial of the case was merely evidence to be considered by the jury in determining whether or not his earning power had been impaired by the accident. Nashville Bridge Co. v. Honeycutt, 246 Ala. 319, 20 So.2d 591. See also Gailey v. Peet Bros. Mfg. Co., 98 Kan. 53, 157 P. 431; Micek v. Omaha Steel Works, 136 Neb. 843, 287 N.W. 645; Reckner v. Gen. Water Co., 131 Pa.Super. 538, 200 A. 297; Keiser v. Philadelphia & Reading Coal & Iron Co., 134 Pa.Super. 104, 4 A.2d 188; Marmon v. Union Collieries Co., 135 Pa.Super. 582, 7 A.2d 156.

Tendencies of the evidence showed that the plaintiff had sustained a permanent injury. Under the Federal Employers' Liability Act the question as to whether the employee's injuries are permanent is generally a question for the jury and the extent of damages in such an action is peculiarly one of fact for the jury. Shelton v. Thomson, 7 Cir., 157 F.2d 709; Hannigan v. Elgin, J. & W. Ry. Co., 337 Ill.App. 538, 86 N.E.2d 388.

We conclude that the judgment of the trial court is due to be affirmed.

Affirmed.

LIVINGSTON, C. J., and BROWN and FOSTER, JJ., concur.