**Corden E. YATES, Libellant,**

v.

**Rodney H. DANN, Ruby M. Dann and R. H. Dann Lighterage and Towing Company, Respondents.**

**Civ. No. 1051.**

**No. 1634.**

United States District Court
D. Delaware.

Sept. 1, 1954.

See also 11 F.R.D. 386.

Henry A. Wise, Jr. (of Wise & Suddard), Wilmington, Del., Abraham E. Freedman (of Freedman, Landy & Lorry), Philadelphia, Pa., for libellant.

Stewart Lynch (of Hastings, Lynch & Taylor), Wilmington, Del., Samuel Handloff, Wilmington, Del., J. Webster Jones, Philadelphia, Pa., for respondents.

LEAHY, Chief Judge.

Libellant was engaged by respondents as a mate on the tugboat "Neptune" on February 8, 1946, under Captain Workman. Yates was a man of 12 years experience in working around the water, was engaged by Rodney H. Dann, one of the respondents, to work on respondents' tugs. Libellant was to be paid $70 a week as wages. The tug was engaged in a dredging operation.

The deckhand, Woods, assigned to libellant-Yates was engaged by Captain Workman several days before the accident happened. It is a duty of a captain or mate to instruct men regarding their duties on tugs. Evidence shows Woods performed his work as a deckhand on the "Neptune" in a satisfactory manner. Nobody ever made complaint to respondents of any unsatisfactory work on the part of Woods. On the evening of April 16, 1946, the "Neptune" was under libellant's sole charge. On that date Yates was assigned to tow certain pontoons. The deckhand secured a line about 100 to 125 feet in length from the pontoons to the after end of the tug and the tow proceeded on its course. After about 20 or 30 minutes, it was found the tow line was too short. It was impeding progress of the tow. Libellant then directed the deckhand to slack off the line to a more suitable length. However, at the time he gave the latter order, libellant observed the deckhand was unsteady and smelled of

liquor. Libellant countermanded his order; after reducing the speed of the vessel, and placing the wheel in charge of one of the other dredge boat employees, he proceeded aft to pay out the line himself. Since the accident occurred about 10:00 p. m., there were only the towing lights illuminating the vessel, which made the faint outlines of the structures visible but no details. As libellant lifted up the line, preparatory to taking off sufficient turns so that it could run out slowly, the line, after it was lifted up only about one-half to one turn, suddenly ran out of control, catching libellant's right foot and crushing it against the bitt. The bones of libellant's right leg and foot, the tendons, circulatory and nervous systems were torn, fractured and mutilated. The master fact as to what happened as libellant ran out the line will be discussed fully later.

Libellant was taken to the Bullock Hospital in Wilmington, North Carolina, in great pain, and an operation was performed. He remained there for thirteen days and was then moved to the United States Marine Hospital in Norfolk, Virginia. He remained as an in-patient in the United States Marine Hospital in Norfolk until June 10, 1946, and was then transferred to out-patient status. While libellant was still under treatment at the United States Marine Hospital in Norfolk, he was compelled, because of financial necessity, to report to respondents for employment. He proceeded to the job on crutches, which he discarded when he boarded the vessel, and thereafter he performed his duties by hopping around as best he could. He continued to perform his duties until he could no longer physically do so on August 15, 1946, and he continued the hospital treatments at the United States Marine Hospital in Norfolk. He again returned to work on December 9, 1946, although he was still in need of treatment and was still under the care of the Marine Hospital in Norfolk, but his return was again prompted by financial necessity. Thereafter, he worked for various employers, going from one to the other, and his changes of employment were affected by his physical inability to perform the work and his need for further treatment. Throughout this latter period of employment, libellant's condition became aggravated; his injured foot became more swollen, despite his efforts to seek the kind of employment which would not require long standing or use of the injured leg. He reported back for treatment at the United States Marine Hospital in May of 1951, where it was found he was still suffering and in need of treatment. He was instructed regarding treatment of the leg again at that time. He was never discharged from treatment by the Marine Hospital in Norfolk.

Libellant suffered severe pain because of the fractures and mutilation of his right leg and foot and from a neuroma which has further aggravated his condition; libellant's injuries were aggravated and his disability prolonged because of the failure to obtain adequate rest and because of his premature return to work occasioned by economic necessity.

Respondents' failure to provide maintenance to libellant resulted in prolongation of libellant's injuries, which have required treatment in the past and which will require treatment in the future.

### Opinion Including Findings

This is an action by a merchant seaman to recover: a. indemnity damages; and b. maintenance and cure. The cause of action for negligence and damages was tried before a jury, which rendered a verdict in favor of Yates, but failed to properly assess the damages in accordance with the charge of the court. After motion, I entered an order granting judgment in favor of libellant, and ordered a new trial limited to the question of damages only. The cause of action for maintenance and cure, agreed by the parties to be decided on the basis of the same facts adduced at the jury trial, was held in abeyance to be determined along with the damage action at the new trial. Upon motion, the action was transferred

to the admiralty side of the court, and a new trial was directed to damages, and maintenance and cure. See, D.C.Del., 11 F.R.D. 386. The case is now ready for disposition of those two issues.

### Issues Involved

Damages:

1. The extent of libellant's past losses;

2. The impairment in libellant's future earning power;

3. The value of libellant's pain and suffering, past and future, and the deprivation to the libellant of the pleasures of life resulting from the injuries.

Maintenance and Cure:

Were the respondents obligated to provide libellant with maintenance and cure following his injury, and, if so, did the obligation continue during the period libellant returned to work for respondents during which he was in need of or could be benefited by medical care and maintenance?

### Facts

The Tugboat "Neptune", owned and operated by respondents, was under the command of Captain Walter S. Workman.[1] It was engaged in tending dredge for the American Dredging Company to deepen the channels of the Brunswick and Cape Fear Rivers from Wilmington, North Carolina, to Southport, and thence into the Atlantic Ocean.[2] The "Neptune" was specifically assigned to move the barges and pontoons, inter alia, in connection with the dredging operation.

Libellant had been following the sea for about twelve years. He was assigned to Captain Workman as mate on the "Neptune" for the night watch.[3] The deckhand on that watch, Wood, engaged by Captain Workman a few days before the accident,[4] had worked with Yates about three watches, and, from Yates' observation, the deckhand seemed to know what he was doing.[5]

On April 16, 1946, Yates was assigned to tow certain pontoons from the mouth of Redmond Creek in the Cape Fear River to a dredge which was operating in the Brunswick River.[6] At the commencement of the watch about 6:00 p. m., Wood seemed to be normal. At about 10:00 p. m. the vessel arrived at the point where the pontoons were located and *the deckhand secured the lines from the pontoons to the bitts on the after end of the tug*. The line was about 100 to 125 feet in length.[7] The tug then proceeded with the tow, with Yates at the wheel and six others on board: Wood, the deckhand, and five other men from the dredge under the command of one Reynolds.[8] After the tow had been underway for about 20 or 30 minutes, it became apparent the backwash from the wheel of the tug was holding up the progress of the tow and retarding its speed.[9] Libellant decided to lengthen the tow line. He called the deckhand to the wheel house and directed him to pay out more line.[10] As the deckhand answered him, libellant observed the latter was very unsteady and he smelled from liquor.[11] Libellant thereupon countermanded his own order because he felt the deckhand was not competent to carry it out.[12] He cut the throttle down and reduced the speed of the tug to the point where it was simply making steerage into the tide, and requested Reynolds to take the wheel while he went aft to slack off the line himself.[13] As he proceeded aft, there were three towing lights up, which cast a small amount of illumina-

---

1. F.R. 181. (F.R. refers to the record of the first trial. S.R. refers to the record of the second trial.)

2. F.R. 24–25.

3. F.R. 142, 182.

4. F.R. 27, 39, 40.

5. F.R. 40.

6. F.R. 3.

7. F.R. 3, 77.

8. F.R. 27.

9. F.R. 92.

10. F.R. 5.

11. F.R. 6 and 89.

12. F.R. 6.

13. F.R. 6–7.

tion over the area, sufficient so he could see the general outlines of the structures of the vessel, but there was no light in the area of the bitts, and the rope as it was coiled around the bitts was not clearly discernible.[14] Normally, when a line is slacked off under these circumstances, several lays of the line may be removed before it will start to run, and one quick turn of the line is sufficient to stop the line from running out.[15] On this occasion, when he reached the bitts, he lifted the line a half-turn to a full turn, and the line suddenly began to run out, completely out of control, and although he tried to escape, his right leg was caught by the running line and crushed against the starboard bitt.[16] So violent was the injury his leg and foot were mutilated and almost completely torn off at the ankle, and the ankle and foot were hanging down limp.[17] His leg was released only after the line was cut with an ax, and the vessel then headed for the hospital in Wilmington, North Carolina.[18] As libellant lay on the deck shortly after the accident, his leg kept jumping and he was in excruciating pain.[19]

During this interval, shortly after the accident, libellant inquired of Wood whether he did not know how to make a line fast, and Wood replied, "This was new to me".[20]

In addition to the findings of fact made here, respondents offered proposed findings of approximately 42 additional facts. Their suggested findings deal with employment of the deckhand Woods; the performance of his duties on the "Neptune"; libellant's duties as mate; descriptions of the pontoons and the float; the condition of the hawser and the condition of its fastening and its method of slack out; lighting conditions on the "Neptune"; libellant's conduct in pre-

paring the slack out of the line; and narration of libellant's hospitalization, medical care, his return to work and his further employment. All of the respondents' proposed findings are, in the main, repetitious of the findings heretofore made and to avoid duplication such proposed findings will not be repeated here, or specifically found as requested. For the most part, there is little, if any, dispute in the record evidence; most of the dispute urged by respondents centers on the inferences or weight to be given the evidence offered by libellant. Where any proposed findings, offered by respondents, may be said to be in conflict with facts already found here, such proposals are rejected, as libellant's evidence, supporting actual findings herein made, has proven more persuasive with respect to the incident of the accident and libellant's purported injuries.

The remaining facts as found show upon arrival in Wilmington, Yates was removed to the Bullock Hospital, where he was immediately given an injection for the pain, but it had very little effect on him.[21] He was then operated upon and his leg was put in a cast.[22] He remained in the Bullock Hospital for thirteen days, after which he was transferred to the United States Marine Hospital in Norfolk, Virginia.[23] The record of the hospital discloses libellant was suffering from "compound dislocation right ankle; cominuted fracture posterior lip right tibia; cominuted fracture lateral malleolus, right, known as Cotton's Fracture".[24] Libellant was transferred to out-patient status on June 10, 1946, at the Marine Hospital in Norfolk, Virginia.

On July 18, 1946, while he was still under out-patient status, he returned to work because of financial necessity [25] be-

14. F.R. 33.

15. F.R. 34.

16. F.R. 8–9 and 84.

17. F.R. 11 and 12.

18. F.R. 11–12.

19. F.R. 12.

20. F.R. 32–33.

21. F.R. 13 and 14.

22. F.R. 14.

23. F.R. 13–14.

24. PX. 12.

25. During the entire period since the date of the accident to the present time, libellant has not received any money whatever in payment of his maintenance,

cause his family was in need and he would have returned to work "even if he had to crawl". It was not a matter of wanting or being able to go back, but rather because he had to return to work.[26] His condition was still so bad on the day he reported for work he had to use crutches to get to the vessel. He discarded them when he went aboard, but he had to hop around in the performance of his tasks as best he could.[27] His rate of pay was $75 per week. He continued in this employment until August 15, 1946, when his foot became so aggravated it swelled up so badly he could no longer stand it, and he returned to the Marine Hospital in Norfolk, Virginia, for further relief on August 16, 1946.[28] He received periodic treatments and he applied home treatments as prescribed by the hospital physician. He was still on out-patient status when he obtained his next employment on December 9, 1946, with E. P. Dann, brother of one of the respondents, at the rate of $210 per month.[29] He left that job on April 10, 1947, because the duties were too strenuous on his foot. He left and obtained employment with the Norfolk Dredging Company, receiving a rate of $1 per hour, where the job was easier and permitted him to sit in a chair while he was standing watch most of the time.[30] He returned to work for E. P. Dann on July 1, 1948, receiving a rate of $300 per month, and remained at the latter employment until July 8, 1949, when he was discharged under circumstances demonstrating his inability to perform the work as he previously had been able to do.[31] He had completed his regular eight-hour tour of duty when he was again called out by Mr. Dann during the night and directed to take the tugboat out on another job. Libellant remonstrated he needed rest and felt he could not undertake the job. Dann did not approve of the idea of his remaining at home, and Dann accordingly released libellant from his employment.[32]

Yates then obtained employment with W. S. Saunders Company in Norfolk as a mate on a tugboat with limited duties requiring him to work half of the time in the engine room and the other half of the time in the pilot house.[33] While this job permitted him to sit down for part of the time when he was working in the engine room and obtain some much needed rest, the foot, nevertheless, ached, became tired and he could not get along with it.[34] His employment with Saunders Company was terminated on January 1, 1950, when the vessel was tied up. He was engaged by the S. C. Loveland Company on January 8, 1950, as a mate on the tugboat at the rate of $200 per month. His duties for this company proved too strenuous because they required him to take the tugboat into rough water in the Chesapeake Bay, where his foot could not stand the strain of long standing or the rolling and pitching of the vessel. He left the Loveland Company for lighter employment elsewhere.[35] The Loveland Company attempted to re-hire Yates as a captain, but Yates refused to accept the assignment because it was too strenuous for his foot.[36] Mr. Tieder of the Loveland Company further admitted the wages of the captain have been increased considerably from time to time since Yates' employment.[37]

Libellant returned to work for the Norfolk Dredging Company on March 1,

which he is admittedly entitled to receive. Had he received such maintenance, he could have sustained himself and been able to give his foot and leg the rest that it needed during one of the most critical periods of his illness.

26. F.R. 15–16.

27. F.R. 16; S.R. 22 and 54.

28. F.R. 16, 104 and PX. 12.

29. F.R. 212; PX. 12.

30. F.R. 18–19; 105.

31. F.R. 22; S.R. 3–4.

32. S.R. 4 and 72.

33. S.R. 5.

34. S.R. 5.

35. S.R. 7.

36. S.R. 7; Dep. Tieder, p. 21.

37. Dep. Tieder, pp. 21–22.

1950, as a captain on a small tugboat at the rate of 95¢ per hour.[38] He was raised in July of 1950 to $1.05 per hour.[39] He was transferred to yard work on January 1, 1951, to March, 1951, at the rate of $1.35 per hour.[40] He was then assigned back to work as captain on the small tugboat in March of 1951 at the rate of $350 per month.[41] The following month, although he did his work, it was, nevertheless, not without a very considerable amount of pain and discomfort. After returning to the job as captain, he again suffered such pain and discomfort he returned to the United States Marine Hospital in Norfolk on May 9, 1951, as an out-patient and received treatment until May 18, 1951. The Marine Hospital Report [42] discloses the following in connection with this period of treatment:

"X-ray revealed calcified area in the joint capsule on the medial side of the ankle joint. The X-ray is quoted in detail: 'Re-examination of the right ankle shows an old healed fracture of the fibula about one and one-half inches from its distal tip. The position of the fragments is good. There is one spur at the former fracture site which presents medially, and which could in some positions, impinge upon the tibia. This is a small rounded fragment lying just distal and medial to the medial malleolus, which probably is an un-united chip from the original injury. This impression is borne out from review of the previous films.

"Impression: Fractures of the right tibia and fibula, healed in the fibula and an un-united chip in the tibia. Attention is called to the spur formation along the medial aspect of the fibula.'—P. B. Parsons, M. D.

"11. Condition Upon Discharge including reason for discharge: The patient was advised to use conservative means to control the pain."

In September of 1951, his rate of pay was raised to $400 per month [43] which he received until December 18, 1952. On the latter date, his status was changed to that of chief engineer on the dredge at the rate of $1.90 per hour.[44] In his present job he is required to work eight hours every day in the week, or a total of 56 hours. The overtime work is not by choice, but is compulsory.[45]

Yates' foot has continuously given him trouble and it is particularly painful on standing or working on it for any substantial period of time. In the last 2½ to 3 years, it has begun to get worse; he is awakened at night with the feeling as though needles are inserted in his leg; his sleep is constantly disturbed and on many occasions he must get up and rub his foot with a warm cloth and massage it before he can continue with his sleep and obtain any rest.[46] He has been constantly treating his foot in accordance with the recommendations by the various doctors that attended him, including massaging and soaking, and his wife massages it with cream.[47] He soaks his foot on the average of about four or five times a week, in which treatment he is assisted by his wife.[48]

In addition to the pain, Yates has been suffering from a numbness in the area below the ankle down to the arch.[49] When he bumps his ankle he does not feel the reaction for some minutes and then it suddenly becomes very painful in the area of the numbness.[50] When he is on his foot for any period of time, the ankle

38. S.R. 7–8.
39. S.R. 8.
40. S.R. 8.
41. S.R. 10–11.
42. PX. 14.
43. S.R. 11.
44. S.R. 12.

45. S.R. 40, 41, 42.
46. S.R. 14.
47. S.R. 14.
48. S.R. 14–15.
49. S.R. 17.
50. S.R. 17.

swells up. He gradually notices the swelling when he feels it necessary to loosen the lace of his shoe, and after he is on his foot for two or three hours it bcomes very painful and he is unable to place any weight upon it.[51]

The condition of his foot has interfered with Yates' ability to improve his employment status, and wage rate. Better jobs have been available to him, if he were physically able to accept them. In his present employment, the job of captain on the larger tugboats could have been his, had he desired, and these paid approximately $550 a month, but he did not take such a job because of the physical condition of his foot.[52]

From the social point of view, whereas prior to the accident Yates was able to engage in the usual social activities with his wife, such as going out to social functions, since the accident he remains at home to rest his foot, and he has undergone personality changes.[53]

 1. Where physical disability in a particular case is such it may extend for a period of time or permanently into the future, the method of ascertaining the measure of damages is by determining the loss of earning power rather than to measure future losses by referring to past losses. A man may have a physical disability which would justify him in accepting only limited employment with a corresponding lower rate of pay, but because of economic necessity a man may assume duties beyond his physical capacity in order to earn a higher rate of pay.

This question was presented to the Supreme Court of Pennsylvania, in Bochar v. J. B. Martin Motors, 374 Pa. 240, at page 244, 97 A.2d 813, at page 815: "The defendants contend that there was no evidence of impairment of earning power and that the fact that Bochar's wages were higher after the accident than before proves no deterioration of earning ability.[1] A tort feasor is not entitled to a reduction in his financial responsibility because, through fortuitous circumstances or unusual application on the part of the injured person, his wages following the accident are as high or even higher than they were prior to the accident. Parity of wages may show lack of impairment of earning power if it confirms other physical data that the injured person has completely recovered from his injuries. Standing alone, however, parity of wages is inconclusive.[2] The office worker, who loses a leg has obviously had his earning ability impaired even though he can still sit at a desk and punch a comptometer as vigorously as before. It is not the status of the immediate present which determines capacity for remunerative employment. Where permanent injury is involved, the whole span of life must be considered. Has the economic horizon of the disabled person been shortened because of the injuries sustained as the result of the tort feasor's negligence? That is the test. And it is no answer to that test to say that there are just as many dollars in the patient's pay envelope now as prior to his accident. *The normal status of a healthy person is to progress, and to the extent that his progress has been curtailed, he has suffered a loss which is properly computable in damages.*" (Emphasis added.)

The same law was enunciated by the Supreme Court of Alabama in the case of Louisville & N. R. Co. v. Steel, 257 Ala. 474, 59 So.2d 664, where claim was made under the Federal Employers' Liability Act, 45 U.S.C.A. § 51 et seq. by an injured railway employee,[54] and the contention was there made regarding the

---

51. S.R. 17–18.
52. S.R. 19–20.
53. S.R. 20.
"1. Some of the increase was due to 'a general high cost of living increase'."
"2. Yeager v. Anthracite Brewing Co., 259 Pa. 123, 128, 102 A. 418."

54. The Federal Employers' Liability Acts are directly applicable in this case since the Jones Act, 46 U.S.C.A. § 688, incorporated all of the statutes into the Maritime Law by reference.

measure of damages that he had not suffered any future losses on the ground he had returned to work subsequent to the accident at the same or an increased rate of pay.[55]

The principle of the decisions is applicable in the instant case. Medical evidence establishes Yates has been working despite a physical handicap which normally would require he not undertake any duties entailing any substantial pressure or use of his leg.

Dr. Flynn, an outstanding and eminent orthopedic surgeon, examined libellant on two occasions and his testimony is strong. His first examination took place at the Delaware Hospital on February 17, 1949, about three years after the accident, at which time he found a swelling of the right ankle and a scar on the outside just above the ankle joint. The scar on the inside was tender and there was partial loss of sensation on the inside of the foot, just below the ankle joint.[56] He characterized the tender scar as a "neuroma", which is the result of a nerve having been cut. It grows out and folds over on its end and it becomes extremely tender.[57] There was also tenderness on the inside and on the outside of the ankle bone with limitation of motion in the ankle joint.[58] X-rays taken two years after the accident revealed there was not complete union in the fracture of the fibula.[59] Dr. Flynn found soft tissue damage around the bone which interfered with the blood supply. This fact accounted for the slowness in the healing process of the fracture. The X-rays also disclosed a small fragment of bone beneath the medial malleolus. This indicated the intensity of the injury and explained the slowness of the recovery.[60] It was Dr. Flynn's opinion, all things being considered, Yates was suffering from a 50% disa-

55. 59 So.2d at page 669: "One of the elements of damages recoverable by the plaintiff under the Federal Employers' Liability Act is the loss or impairment of plaintiff's earning power. The admissibility of mortality tables showing plaintiff's life expectancy and the admissibility of expert testimony to show the present value of any loss sustained is recognized. This court has held that where there is evidence from which there is a reasonable inference that a plaintiff's injuries are permanent, the mortality tables are admissible. Southern R. Co. v. Cunningham, 152 Ala. 147, 44 So. 658. Furthermore the plaintiff is not precluded from recovery for impairment of his earning power by reason of injuries sustained by him because he returned to work in October 1949 and worked up until the time of the trial in December 1950. *It is held that wages actually earned by a person and his earning power are not identical.* The fact that the plaintiff worked for appellant for several months prior to the trial of the case was merely evidence to be considered by the jury in determining whether or not his earning power had been impaired by the accident." (Emphasis added.)

In Carter v. United States, 4 Cir., 49 F.2d 221, 223, the Court lay down the rule in these terms:

"The mere fact that a claimant may have worked for substantial periods during the time when he claims to have been permanently and totally disabled is not conclusive against him. The question is not whether he worked, but whether he was able to work, i. e., whether he was able to follow continuously some substantially gainful occupation without material injury to his health. Of course, the fact that a man does work is evidence to be considered by the jury as tending to negative the claim of disability; but the fact that he works when physically unable to do so ought not defeat his right to recover if the jury finds that such disability in fact existed."

The same rule was enunciated in United States v. Phillips, 8 Cir., 44 F.2d 689, 691:

"Some persons, who are totally incapacitated for work, by virtue of strong will power may continue to work until they drop dead from exhaustion, while others with lesser will power will sit still and do nothing. Some who have placed upon them the burdens of caring for aged parents or indigent relatives, feeling deeply their responsibility and actuated by affection for those whom they desire to assist, will keep on working when they are totally unfit to do so."

56. F.R. 42.

57. F.R. 43.

58. F.R. 43.

59. F.R. 43–44.

60. F.R. 44.

bility.[61] On cross examination it was developed the extra growth of bone on the inside of the ankle sets up an irritation when libellant stands or walks and it results in swelling and pain. It was Dr. Flynn's view Yates is not competent to do more than half a day's work; at the end of four hours, his foot becomes completely played out.[62]

The second examination took place on March 18, 1954, at which time he found Yates was still having trouble with his ankle. The neuroma was still present. There was a severe scar extending around the inside of the ankle from front to back, with a loss of sensation below it and in the scar itself. There was enlargement and tenderness of the ankle joint. At the second trial, Dr. Flynn testified the disability in the foot had improved somewhat but Yates now had a permanent partial disability of 35%. This meant Yates could not use his leg for standing or walking more than five hours during a regular eight hour day.[63] The tingling and burning sensation which Yates described in his foot is due to the severed nerve in the soft tissue scar.[64] There was spur formation on the fibula. It is not arthritis per se. It is the same type of process as arthritis which refers generally to the joint, but in this case it was away from the joint.[65] Dr. Flynn did not believe Yates could work eight hours a day using his foot. Walking on uneven surfaces caused increased strain on the foot and ankle, and Yates would have trouble climbing.[66]

Dr. Springer, who examined libellant on behalf of respondents, testified his examination was essentially negative, except for a 20 degree loss of flexion in the ankle, which was due to the spur formation over the ankle.[67] On cross examination, Dr. Springer admitted the injured ankle was $7/8$ths of an inch greater in circumference than the left ankle. He had first examined Yates on January 15, 1949, and his last examination was March 8, 1954. In his former examination, he testified the measurements of both ankles had been the same.[68] When asked to explain the vast difference in circumference between the two ankles, he gave these answers which are of significance in determining the effect of the work which libellant has been performing insofar as it relates to his present condition.[69]

"A. I made a note there of the measurement of the ankle joint.

"Q. Will you show it to me, please? A. Yes, here (indicating).

"At the present time the measurements are as follows: right ankle—$10\frac{3}{8}$ inches; left ankle—$9\frac{1}{2}$ inches; arch of both feet—$9\frac{1}{2}$ inches.

"Q. So that now you have an additional $3/4$ ($7/8$) of an inch difference in the right ankle, is that right? A. That is right.

"Q. Would you explain how that came about, sir? A. Well, he probably has been on his feet. I mentioned there he has a certain percentage of loss of function as a result of the injury. Now, part of that percentage is due to stiffness, part of it is due to pain, part of it is due to swelling, all of which put together make up that 20 per cent loss of function.

"Q. And the more he uses it the greater it is going to swell up; is that correct? A. That is what he says. I don't know necessarily that it has to be true, but he says so. But there was that difference when I saw it.

61. F.R. 44–45.
62. F.R. 49–51.
63. S.R. 58–59.
64. S.R. 59.
65. S.R. 60.
66. S.R. 61.
67. S.R. 33–34.
68. F.R. 67.
69. S.R. 36.

"Q. But you actually found there was a very substantial difference in the measurement now? A. Yes, sir.

"Q. And that difference comes about as a result of use of the leg? A. I would think so, yes."

This testimony of Dr. Springer corroborates libellant's complaints of pain and inability to perform his duties. That testimony, also, supports the view if libellant continues in the performance of his present duties, his condition will become more aggravated; his disability will be accentuated; his loss of earning power will be cut down and his earning power will be cut short.

Since libellant's return to work, he has not only been under constant treatment at home under instructions from the Marine Hospital, but he has also found it necessary to visit the Marine Hospital for further treatment. Yates' condition is steadily deteriorating. He engaged as a mate and as a captain for as long as he could, until he finally had to give that up entirely, and he presently has been fortunate enough to obtain employment as an engineer where he is able to rest his leg between his rounds in the engine room. Even with this limited duty, libellant's foot has been continuing to swell. There is a question as to how long he will be able to maintain his present employment and equally serious is the question of what will happen if he should lose his present job. Evidence in this case supports the view libellant's physical disability resulting from the accident has reduced his earning power by more than 35%, which is the extent of his physical impairment.

There will be considered the percentage of physical impairment as the measure of libellant's future loss of earning power. So far as the past losses are concerned, there will be considered the difference between what libellant has actually earned against what he would have earned.

2. In arriving at past losses, a consideration can be made first of all money which libellant was capable of earning but for the accident, and that sum should be reduced by the sum which the libellant in fact earned.

At the time of the accident libellant was earning the sum of $300 per month, and he could have taken the job as tugboat captain on either of the two larger tugboats at a rate of $550 per month. In determining past losses there is the mean between $550 per month and $300 per month. The average of these two figures is $425 per month. The critical figure here is the amount of $550 per month which Yates would have received if he had obtained and had performed the duties of a tugboat captain on a larger tug. However, the $550 monthly amount is obviously based on a theoretical assumption and while the utilization of such a figure will not be condemned because it may be said to fall within the realm of speculation, I cannot accept the $550 amount as basic or as unquestioned demonstrative evidence, for Yates never took the job which would have paid him this amount. For purposes of permitting libellant to state his cause, however, the figure will be, for the moment, considered as a calculating factor.

From April 16, 1946, to July 18, 1946, a period of three months and two days, libellant was out of work and his total losses during this period therefore total $1,303.34

From July 18, 1946, to August 15, 1946, a period of four weeks, libellant returned to work for respondents and received the sum of $300.00. Using the average rate as the base, he would have received for the latter period the sum of $396.76, and the difference in pay amounts to 96.76*

* Asterisk notation indicates amounts calculated by the Court. Libellant's estimated figure is $95.76.

From August 15, 1946, to December 9, 1946, he was again out of work receiving treatment. For this period of three months and 24 days at the rate of $425 per month, he suffered a loss of $1,615.08

On December 9, 1946, he returned to work for E. P. Dann to April 10, 1947, a period of four months and one day, during which he received the total sum of $1,245. For this period of time he would have received $1,714.17 at the average rate of $425. His loss of pay for this period, therefore, is 469.17

From April 10, 1947, to July 1, 1948, libellant worked for the Norfolk Dredging Company and received total pay of $4,208.12 for a period of fifteen months, less nine days. At the base rate of $425 per month, he would have earned $6,247.47, making his losses during this period the sum of 2,039.35

On July 1, 1948, he returned to the employ of E. P. Dann and worked until July 8, 1949, when he was discharged because of his inability to perform his duties and during this period he actually earned the sum of $3,670, covering a period of twelve months and seven days. At the base rate of $425 per month, he would have earned $5,199.19. This makes a loss during this period in the sum of 1,529.19

Libellant was out of work from July 8, 1949, to July 22, 1949, and on the latter date entered the employ of W. S. Saunders to January 1, 1950, during which period he was paid at the rate of $225 per month and earned a total sum of $1,200. At the base rate of $425 per month, he should

have earned $2,450.81, making his losses for that period 1,250.81

He was out of work from January 1, 1950, to January 8, 1950, and on the latter date became employed by the S. C. Loveland Company to February 28, 1950, during which period he earned the sum of $424.16. His earnings during the period from January 1, 1950, to March 1, 1950, should have been $850 at the rate of $425 per month, making his losses the sum of 425.84

He returned to the employ of the Norfolk Dredging Company on March 1, 1950, and from that date until January 1, 1953, he earned the sum of $13,200. During this period he would have earned at the basic rate of $425 per month the sum of $14,450, making his losses during that period the sum of 1,250.00**

From January 1, 1953, until the time of trial while his actual earnings were less than his earning power of at least $550 per month, they approximated the average between $550 per month and $300 per month, and, therefore, no claim is or should be made for past losses during that period.

The total out of pocket losses, therefore, which libellant claims he has at least sustained by reason of his disability is a minimum of 9,979.54**

As stated, the sought recovery for past losses is based on the $550 figure. While I do not reject that figure in its totality, I conclude it is more than probable that Yates would have, if the fact had been established, received a lesser monthly payment. I

shall, therefore, lower the basic figure of computation for the reasons discussed later and reduce past losses by reason of his disability to 3,992.00

3. As to future losses, Dr. Flynn pointed out Yates should not work more than five hours a day. For the purpose of calculation, Dr. Flynn's estimate of 35% of disability will be considered based on his estimate libellant is unable to work more than five hours a day. The swelling which Dr. Springer found on the right ankle is proof sufficient of aggravation which libellant is inflicting upon himself because of the long hours which he is working. Libellant seeks to compute his future losses from the time of the last trial on March 15, 1954, when he was 44 years of age, for the balance of his life expectancy, which at that time was 29.61 years.

Libellant assumes his productive life expectancy would be to age seventy, and for compilation he takes the period of 27 years, in calculating his working life expectancy. Again he utilizes the theoretical assumption he will earn a minimum of $550 per month. On such a basis 35% of $550 per month is $192.50 per month, or $44 per week, representing libellant's weekly future losses. Extending this weekly loss for the next 27 years, and discounting it for purposes of present value at the rate of 2½%, the figure which all of the insurance companies use in the calculation of annuities, the value of $1 per week at the end of 27 years (1404 weeks) is $1,024.48,[70] which, for $44 per week makes the present value of libellant's future losses the sum of $45,077.12.* I shall, however, as present value of libellant's future losses, award the sum of $18,031.

4. The record demonstrates libellant suffered excruciating pain from the instant of accident when his foot was crushed against the bitts and almost torn off. After operation he suffered a period of extreme pain during convalescence. Since his return to employment, he has endured suffering.

A reasonable sum to compensate libellant for the original pain endured immediately after the accident, he submits would be $5,000. For the balance of libellant's life during which he will continue to suffer pain he suggests a reasonable and fair figure to compensate him would be at the rate of $500 per year, which for the period of his life expectancy (36.49 years) from shortly after the accident makes a total of $18,245. For the element involving pain and suffering and loss of life's pleasures, he submits a fair figure would be the sum of $23,245. As to this particular item, I award $9,-298.

To summarize, libellant argues the value of the cause of action for damages should be recapitulated as follows:

| | |
|---|---|
| For past losses | $10,449.64 |
| For future losses | 45,056.00 |
| For pain and suffering and loss of life's pleasures | 23,245.00 |
| Total Value of Cause of Action for Damages | $78,750.64 |

5. Libellant conceded at pretrial respondents as part of their case in mitigation of damages could bring forth or point out on the basis of the evidence already adduced in the case any contributory negligence on the part of libellant. From the evidence, this is a case which calls for the application of the comparative negligence rule. In this connection there are certain critical facts which must be given review. Libellant did not pause to see how the line was secured to the stern bitts non constat he could not have determined the negligent fastening of the tow line if he had looked carefully. The question of whether libellant had the opportunity to see the manner in which the line was made fast is

70. See booklet on present value compiled by George B. Elliott, Compensation Actuary, Pennsylvania Insurance Department, p. 27.

* Libellant's estimated figure—$45,056.00.

a close one. When the line did not slack libellant kicked it and he must have known the line would then run out. Libellant argues the evidence shows he kicked the line only after his foot became entangled and as the line was running out fast. Respondents insist libellant kicked the line while attempting to slack it off, and it was this act of negligence which caused the accident. The testimony of the incident was given by witness Kirk. At the time Kirk testified libellant moved to strike the testimony because respondents had failed to disclose this information in a pretrial discovery proceeding which was held just before the trial. The record discloses that at trial the following occurred:

(F. R. 135)

"Mr. Wise: I have a motion to make in connection with the testimony of the witness Kirk. That is a motion to strike so much of his testimony as related to kicking the roll. The basis for that motion is two-fold, that in the answer in this case contributory negligence was pled. I can only conceive that the purpose of that testimony was to indicate contributory negligence. In examining Mr. Dann the day before the trial I asked him what that contributory negligence consisted of, allegedly consisted of, and he replied to me the plaintiff was negligent in leaving his usual post with his machinery running and not properly tended and walking back to the stern of the vessel and slacking off the hawser when he knew it to be dangerous.

\* \* \* \* \* \* \*

(F. R. 136)

"The Court: Well, one view I took of the testimony, quite frankly, yesterday is this: I don't see where it is inconsistent with Yates' testimony, because Yates' testimony was that he picked the rope up and the line started to go out, and he tried to kick his foot loose so as not to be caught in it.

"Mr. Wise: I think it is subject to that interpretation, sir.

"The Court: That being so, I think it is a matter of argument to the jury. Do you want to be heard on it, Mr. Lynch?

"Mr. Lynch: Oh, no, the Court has already pointed out the very things I was going to say."

Having once agreed with the Court's understanding of the "kicking" incident at trial, respondents now argue a different interpretation upon the evidence. Regardless whether respondents' position on this point is accepted or rejected, there is evidence of the fact there was "kicking". Neither the Court's understanding of the evidence at trial nor libellant's or respondents' versions of their various interpretations of this particular evidence can alter the master fact that at some point during the procedure which libellant followed in loosening the line, *the fact of kicking the line is present*. In short, libellant determined the manner of causing the line to run out. As soon as the line loosened it ran out of control catching libellant's right foot and crushing it against the port bitt.

What caused the line to run out is the question.

■ Examination of comparative evidence is ground for mitigation of damages. Jones Act, 46 U.S.C.A. § 688. See, Socony Vacuum Oil Co. v. Smith, 305 U. S. 424, 59 S.Ct. 262, 83 L.Ed. 265; Walker v. Lykes Bros. S. S. Co., Inc., 2 Cir., 193 F.2d 772, 774–775; McLeod v. Union Barge Line Co., D.C.W.D.Pa., 95 F.Supp. 366, affirmed 189 F.2d 610; Lawrenson v. Chas. Kurz & Co., Inc., D.C.E.D.Pa., 91 F.Supp. 1000; cf. Vivian v. Gulf Oil Corp., D.C.E.D.Pa., 103 F.Supp. 391; (dissent) Shields v. U. S., 3 Cir., 175 F.2d 743–747. In addition to urging the doctrine of comparative negligence, respondents also argue whatever negligence is in the cause is *all* on libellant's part and there should be no recovery whatsoever for libellant.

■ I think the negligence of both parties attaches to the running out of the line. In applying the doctrine of comparative negligence, after reviewing the

entire record in this cause, I conclude there should be a 60–40% division [71] of negligence finding and conversely of the potential damages recoverable on the basis of the mutual negligences of both libellant and respondents.

I conclude, therefore, that in the action for damages the recapitulation of the items should be as follows:

For past losses................ $ 3,992.00
For future losses............. 18,031.00
For pain and suffering and loss of life's pleasures........... 9,298.00

Total value of cause of action for damages as allowed by the Court...... $31,321.00

6. The principle is entrenched in the Maritime Law the shipowner must furnish all necessary care and maintenance. This rule is so whether or not the seaman requests such aid. Jamison v. Encarnacion, 281 U.S. 635, 50 S.Ct. 440, 74 L.Ed. 1082. In this case, respondents ignored the rule relative to their obligation. This duty does not end with the termination of the voyage, but continues beyond that time depending upon the facts. No set rule can be found in the cases, but the duty has been extended to meet the particular need in each individual case.

In the case at bar, respondents were aware of the accident and the extent of the injuries. Common humanity, as Judge Maris pointed out in Calmar S. S. Corp. v. Taylor, 3 Cir., 92 F.2d 84, 87, dictated respondents should have made sure Yates received full and proper treatment and maintenance. Respondents failed to observe the elemental requirements. No attempt was made to provide maintenance when libellant was discharged to out-patient status from the United States Marine Hospital. Economic necessity drove libellant back to work on July 18, 1946, when he was still under treatment at the United States Marine Hospital in Norfolk. In fact, he was using crutches when he returned to the vessel and thereafter. When he returned to work for E. P. Dann on December 9, 1946, he had not yet been discharged by the Public Health Service. Libellant returned to the hospital when pain became more intense and received further out-patient treatment during the period from May 9, 1951, to May 18, 1951.

In this case right to maintenance and cure continues from the time of his discharge as an in-patient in the Marine Hospital on June 10, 1946, to the present date, during which time libellant has been in need and should have been benefited by medical care and attention. The painful condition has persisted. The Public Health reports disclose at no time was he discharged from out-patient status, and the last report in 1951 discloses he was still in need of treatment at that time. Testimony establishes libellant is still suffering from a painful condition. Under the facts of this case, libellant is not to be penalized because he returned to work during periods when he should have been convalescing or reporting to the hospital for further treatment. The fixing of an award as to this phase of the case is not without difficulty.

Rates of maintenance and cure have been set up in union contracts which control virtually the entire maritime industry. Thus in Curd v. United States, D.C., 118 F.Supp. 921, 1954 A.M.C. 484, it was held the court may take judicial notice of the rate of maintenance as contained in union contracts. But here libellant was not a member of any union. The rate of maintenance as fixed in the industry may be considered, however, as one factor tending to show the reasonable value of cost of maintenance and cure. Under judicial notice, cost of maintenance prior to June of 1952 was generally fixed at $6 per day, while after that date it was increased to $8 per day. Accordingly, libellant argues he is entitled to maintenance from June 10, 1946, the date of his discharge from the

71. Libellant 60%—respondents 40%.

hospital, to June 1, 1952, a period of 2,181 days, which at the rate of $6 per day totals $13,086; and from June 1, 1952, to March 15, 1954, a total of 640 days at the rate of $8 per day, there would be a total of $5,120. Libellant claims, therefore, he is entitled to the total sum of $18,206 for maintenance and cure.

Allowance of maintenance and cure should not duplicate compensatory awards for past and future losses of wages. There can be no cumulative awards. Since the awards granted as to all other items of damage supra are substantial, libellant's request for maintenance and cure as sought will be denied. Libellant seeks $18,206 in the cause of action for maintenance and cure. Libellant will be allowed, however, the sum of $2,821 for maintenance and cure.

Libellant is entitled to receive total recoveries of $31,321 in the cause of action for damages, etc., and $2,821 in the cause of action for maintenance and cure.