107 So.2d 873

### SOUTHERN RAILWAY COMPANY
v.
### Millard STALLINGS.

6 Div. 63.

Supreme Court of Alabama.
Nov. 6, 1958.

Rehearing Denied Jan. 8, 1959.

464

Cabaniss & Johnston, Leigh M. Clark and Drayton T. Scott, Birmingham, for appellant.

Jackson, Rives, Pettus & Peterson, Birmingham, for appellee.

GOODWYN, Justice.

This is an appeal by Southern Railway Company, defendant below, from a personal injury judgment in favor of Millard Stallings, plaintiff below, for $30,000 and from an order overruling defendant's motion for a new trial. The action is brought under the Federal Employers' Liability Act. 45 U.S.C.A. § 51 et seq.

Plaintiff was injured on June 14, 1954, while working for the defendant as a boilermaker in its Norris Yards in Jefferson County. The case went to the jury only on count two as last amended. For answer to the complaint the defendant interposed a plea in short by consent. Amended Count two alleges that plaintiff "was caused to slip and fall by reason of an oily and slippery place on the floor" of the diesel shop where he was working. It is charged that defendant "negligently failed to exercise reasonable care to furnish and maintain plaintiff a reasonably safe place to perform his work for the defendant." Plaintiff's injuries and damages are alleged to be as follows: "The bones in plaintiff's right hand were broken and crushed and the muscles, nerves, tendons and ligaments in his said hand were torn and injured," which caused great physical pain and mental anguish to plaintiff; that plaintiff "was permanently injured"; that "he will be caused to suffer great physical pain and mental anguish in the future"; that "his nerves and nervous system were shocked and impaired and he was caused to be hospitalized and caused to undergo serious and painful medical and surgical care and treatment for said injuries"; that he "was caused to lose wages from his regular employment as a boilermaker and his power and capacity to work and earn money has been permanently impaired."

While not admitting that defendant's negligence proximately caused plaintiff's injury, the defendant says in brief that "the point is not made on this appeal that a jury issue was not presented as to liability or that the verdict as to liability is against the great weight of the evidence."

The points argued by appellant, and relied on for reversal, are thus stated in its brief:

I. "A verdict for $30,000.00 in favor of a 54 year old boilermaker for a fractured right wrist, not disabling him from general remunerative employment, is excessive."

II. "In the absence of some evidence of total disability the computation of an actuary as to the present value of full earnings projected over a period of plaintiff's life expectancy is incompetent and prejudicial."

III. "An instruction which invades the province of the jury is erroneous."

IV. "Refusal upon appropriate request to instruct the jury that if any juror is not reasonably satisfied from the evidence of the plaintiff's right to recover or of the truth of all the material averments of at least one count of the complaint constitutes reversible error."

I.

After carefully considering the evidence, in the light of applicable rules of review, we find no justifiable basis for ordering a remittitur (as a condition to affirmance) on the ground that the jury's verdict was excessive.

When this court has before it a question of excessiveness of a jury's verdict there are certain well-established rules which control our review. As said in Louisville & Nashville Railroad Co. v. Tucker, 262 Ala. 570, 581, 80 So.2d 288, 298:

"This court has laid down the principle that a verdict will not be disturbed as excessive where the trial court has refused to disturb the amount unless so excessive as to indicate passion, prejudice, corruption or mistake. Montgomery City Lines, Inc., v. Davis, 261 Ala. 491, 74 So. 2d 923. And we have held that the correctness of a jury's verdict is

strengthened when the presiding judge refuses to grant a new trial. Simpson v. Birmingham Electric Co., 261 Ala. 599, 75 So.2d 111; Gulf, Mobile & Ohio R. Co. v. Sims, 260 Ala. 258, 69 So.2d 449. Furthermore this court has said that, 'Where there was evidence which, if believed, authorized the verdict [this court] will not reverse a judgment refusing a new trial.' Montgomery City Lines, Inc., v. Davis, supra [261 Ala. 491, 74 So. 2d (923) 926]; Union Central Life Ins. Co. v. Guffin, 232 Ala. 254, 167 So. 321; Ray v. Richardson, 250 Ala. 705, 36 So.2d 89; Kurn v. Counts, 247 Ala. 129, 22 So.2d 725.

\* \* \* \* \*

"Our cases consistently hold that the present value of a dollar as compared with its value in former years must be considered in determining whether the amount awarded by a jury is excessive. Birmingham Electric Co. v. Thompson, 251 Ala. 465, 37 So.2d 633; Birmingham Electric Co. v. Howard, 250 Ala. 421, 34 So.2d 830; Magic City Bottling Co. v. Tolbert, 34 Ala.App. 516, 41 So. 2d 619."

See, also, Firestone Tire and Rubber Company v. Nixon, 264 Ala. 433, 435, 87 So.2d 829; Hudson v. Stripling, 261 Ala. 196, 203, 73 So.2d 514; Alabama Great Southern R. Co. v. Baum, 249 Ala. 442, 449, 31 So.2d 366, 372. In the last cited case (an action under the Federal Employers' Liability Act) it was said:

"In cases of this character, even the trial court will not set aside the verdict of the jury merely because, in its opinion the jury gave too much or too little; and when the trial court has refused to disturb a verdict on account of the amount recovered, the appellate court is very reluctant to substitute its judgment for that of the jury and the court below. We will not do so unless the amount is so excessive, or so grossly inadequate, as to be indicative of prejudice, passion, partiality, or corruption on the part of the jury. Florence Hotel Co. v. Bumpas, 194 Ala. 69, 69 So. 566, Ann.Cas.1918E, 252; Central of Georgia R. Co. v. White, 175 Ala. 60, 56 So. 574."

The plaintiff in the case before us, at the time of his injury on June 14, 1954, was 51 years old. He had been employed by defendant since the age of 15, the first four years as an apprentice boilermaker and thereafter as a "full-fledged" boilermaker. He left school in the 7th grade. During the two years prior to his injury his monthly earnings were around $375 a month. Between the time of his injury and the date of trial (April 23 and 24, 1956) plaintiff was able to work a total of "about 30 or 31 days." There is medical testimony (Dr. S. Ralph Terhune, an orthopedist of Birmingham) that plaintiff had a 50% permanent disability in the use of his right wrist; that he had a badly displaced fracture of the large bone of the forearm at its distal end with severe displacement of the fragments, and multiple fracture lines, and also a fracture of the ulna styloid. Dr. Terhune first saw plaintiff on September 20, 1954, when he was sent by another doctor for treatment. His testimony is stated in appellant's brief to be as follows (which we think, with some additions, is adequate to show the nature of plaintiff's injury):

"\* \* \* He was complaining of discomfort and deformity in his right wrist region. The circulation seemed good and there did not appear to be any major nerve disturbances. There was roughening of the end of the large bone of the forearm where it joined the wrist. X-rays revealed that he had had a badly displaced fracture of the large bone of the forearm at its distal end with severe displacement of the fragments and multiple fracture line. There was also a little fracture of the ulna styloid. The larger fracture had a solid bony union but there was no evidence of healing of the fracture of the ulna styloid at the time Dr. Terhune first saw plaintiff. The shorten-

ing of the radius of about a quarter of an inch had caused the radial deviation of the hand at the wrist. At that time Dr. Terhune thought Mr. Stallings would improve with conservative treatment, which was given. On October 4, 1954, plaintiff complained of some discomfort but to a much less degree and said he was much improved by the treatments and that he was using his hand and wrist more. On October 25 he was worried about the continuance of discomfort in the region of the ulna styloid of the wrist. On November 5 Mr. Stallings reported his wrist was better but he had had a bad cold which had prevented him from coming for his treatments. On November 12 he said his wrist was feeling better and his bad cold was much better and he was advised he should return to work. He returned to the doctor on November 19 and stated that he had returned to work on November 13 but had twisted his wrist on November 18 and that this had caused him severe pain. At that time he had some swelling around the soft tissues of his wrist. On December 3 he reported that he had continual pain in his wrist. He was X-rayed again and Dr. Terhune recommended surgery to consist of removal of the styloid and shortening of the ulna to accommodate for the narrow short radius. He was admitted to the West End Baptist Hospital on December 12 and the surgery recommended was performed on December 13. The ulna styloid was removed and about an inch of the distal end of the ulna shaft was taken out to make it conform to the shortened radius. The torn ligament was repaired and stabilized. He remained in the hospital five days. The incision healed nicely and he was given physiotherapy and heat treatments. In January, 1955, he had gained motion, strength and had much less pain. He had much improved motion of his hand and wrist. Dr. Terhune continued to treat him frequently, but in March thought he could stop his treatments at the office. He saw him again on March 11, 1955. He made a good full fist. There was some weakness of his grip. At that time he was not able to do heavy lifting and straining, but there were some things he could do. He could do certain types of boilermaker work, but he could not do some of those things. According to Dr. Terhune he had about fifty per cent permanent partial loss of his right wrist. Dr. Terhune thought he should try to return to work. Mr. Stallings reported to Dr. Terhune again on March 25, stating that he went to work on March 14 and stating that his hand was hurting him because of hammering on an air reservoir surface and that about two hours of such hammering was necessary for certain periodic testing and that he had been bothered in his work by trying to hold up some type of overhead plates with both hands and reported difficulty in handling materials. His grip was weaker than his left grip, but he had full range of motion in his grip and he had finger motion. His wrist motions were still somewhat limited. He returned on April 3, 1955, and stated that he had told his foreman he just could not do what he had to do because of the pain and weakness in his right wrist, that he could not pick up heavy things, that he could not use a screw-driver, that he was handicapped in climbing, and that it even bothered him in using his knife and fork. There was no nerve or blood vessel disturbance. At that time Dr. Terhune found that his grip was about fifty per cent weaker than in his other hand. He lacked about thirty degrees of flexion in his wrist downward and a very slight limitation in bending his wrist backwards or upwards. He had recovered good motions from side to side in his wrist. Dr. Terhune found after plaintiff so stated that he could not continue with his usual occupation due to weakness of his wrist and hand

and the pain produced in his hand when he attempted to carry on his usual occupation but that he could do labor not requiring heavy lifting, hammering and climbing. Dr. Terhune had not seen plaintiff for a year the month of the trial. He examined plaintiff's wrist at the trial and found that the result of the operation was good and that he was very well pleased with it. The sum total of it was that he had a permanent partial disability of his right wrist and hand."

Dr. Terhune also testified that he felt that plaintiff "had had all necessary treatment and that he had reached maximum improvement" as to the operation performed on plaintiff's wrist. He further testified, in part, as follows:

"I made an incision about two inches long along the forearm exposing the distal ends—the distal end of the ulna on the little finger side. And I found that that ulna styloid was loose, and that there was no union, and took it out, along with about an inch of the distal end of the ulna shaft; sawed it off and took it out to shorten that ulna to a more or less normal relationship with the now shortened radius which occurred from the fracture. Then I found the torn ligament, found what I thought was sufficient ligament tissue to pull it around the ulna and the radius and repair it for stabilization.

"That was the extent of the operation."

■ There was evidence from which the jury could find that plaintiff was wholly incapacitated from doing his work as a boilermaker.

There was evidence from which the jury could find three elements of damages, viz.: The loss of wages from the time of the injury to the date of trial, plaintiff's pain and suffering resulting from the injury, both past and future, and impairment of his earning capacity. It appears to be established that the loss in wages as of the time of trial approximated $8,000. As to the

fixing of damages for pain and suffering, this court, speaking through Mr. Justice Sayre in Whitman's Fifth Ave. Garage Co. v. Ricks, 211 Ala. 527, 529–530, 101 So. 53, 55, had this to say:

"Dealing with the motion for a new trial, we need consider only defendant's contention that the damages assessed are excessive. We cannot avoid the suspicion that the jury in this case have been rather too liberal with the money of defendant; but further than that we cannot go. Defendant assumes that much of the assessment should be charged to plaintiff's illness in December, but we do not find this to be necessarily so. Whether so or not, there is no fixed standard for the admeasurement of damages in such cases. Damages for physical pain and mental anguish are in large measure discretionary, and the universal rule is not to reverse on that account unless the amount is so excessive or inadequate as to indicate prejudice, passion, partiality, or corruption—not an easy conclusion after the trial court has approved the verdict. Central of Georgia R. Co. v. White, 175 Ala. 60, 56 So. 574. In the present case we conclude, though not without misgiving, that the assessment should be allowed to stand."

■ As to diminution in plaintiff's earning capacity the evidence is clear that he had a permanent injury to his right wrist incapacitating him from working as a boilermaker, the only kind of employment he had been engaged in for about 37 years. There appears to be no controversy that his life expectancy, at the time of the trial, was 19.17 years, without considering the kind of work he was engaged in, and 17.50 years as a boilermaker for a railroad. Although there is no evidence specifically defining the extent of plaintiff's overall incapacity to engage in gainful work, it nevertheless was a question for the jury, in their fair and enlightened discretion, to fix the amount of damages

for impairment of earning capacity. Armour and Co. v. Cartledge, 234 Ala. 644, 648, 176 So. 334; Walker County v. Davis, 221 Ala. 195, 199, 128 So. 144; Birmingham Electric Co. v. Cleveland, 216 Ala. 455, 459–461, 113 So. 403. From Walker County v. Davis, supra, [221 Ala. 195, 128 So. 148] is the following:

"While in later cases the court made a limitation upon the rule stated in these just cited, by which nominal damages are not now the limit of recovery for *impaired earning capacity* as it is for *lost time*, when the evidence does not furnish data by which to measure accurately the amount of the loss, the authority of those cases to the effect that when damages may be recovered upon the pleading and proof, but the evidence is not sufficient to furnish a proper basis for a substantial amount, nominal damages may be recovered. As to impaired earning capacity, like mental and physical pain, mutilation, disfigurement, or loss of an organ, it is shown to be difficult to furnish a standard for measurement, and the amount is to be fixed by the jury in their fair and enlightened discretion. Birmingham Elec. Co. v. Cleveland, 216 Ala. 455, 113 So. 403; Gray v. Cooper, 216 Ala. 684, 114 So. 139; Mackintosh Co. v. Wells [218 Ala. 260, 118 So. 276], supra."

See, also, Newton v. Altman, 227 Ala. 465, 467, 150 So. 698; Mackintosh Co. v. Wells, 218 Ala. 260, 264, 265, 118 So. 276; Gray v. Cooper, 216 Ala. 684, 685, 114 So. 139.

■■ Considering the elements of damage and "remembering that the authority vested in courts to disturb the verdict of a jury on the ground of excessive damages is one which should be exercised with great caution" (Louisville & Nashville Railroad Co. v. Tucker, supra), we are constrained to hold that the trial court's refusal to set aside the verdict on the ground of excessiveness should not be interfered with. We are unable to say

that the amount of the verdict is the result of passion, prejudice, partiality or corruption on the part of the jury, especially in view of the trial court's refusal to set the verdict aside after hearing the evidence.

## II.

As already noted, one of plaintiff's witnesses was an actuary (William L. Farmer, Chief Actuary for Protective Life Insurance Company) who testified as to plaintiff's life expectancy. During the course of his examination he was asked the following question:

"Q. Now I will ask you, Mr. Farmer, if you can tell us what amount of money invested today at 3 per cent per annum compounded annually would produce earnings or income of $375 per month for 17.50 years so that at the end of 17.50 years the entire principal sum invested today and all earned interest on that investment fund using the rate of interest at 3 per cent compounded annually would be consumed and eaten up and used up so that there would be no principal or interest left at the end of 17.50 years?"

To this question the defendant interposed the following objection:

"Mr. Clark. We object to that, if the court please, because it is not predicated on any evidence in the case. It involves a false hypothesis and a hypothesis that is not correct according to the undisputed evidence in this case. This gentleman is not totally disabled from earning a livelihood. The only doctor that testified in the case said he was able, and further evidence shows that he has taken a pension voluntarily, and the only purpose in the world is to try to get some big figures here that are contrary to the undisputed evidence in this case so far; immaterial, irrelevant and incompetent."

The objection was overruled. The actuary then testified that the amount needed to produce $375 per month for 17.50 years at 3% was $61,397.55. In response to further questioning he testified that the amount needed at 3½% was $60,069.18; at 4%, $56,872.95; at 4½%, $54,799.95; and at 5%, $52,841.49.

The defendant, in its brief, recognizes that "most courts, including this court, are committed to the proposition that in a case claiming damages for the permanent impairment or loss of earning capacity, evidence as to life expectancy and the present value of a reduction of earnings due to the injury is admissible." But, says the defendant: "If that were all that is involved here, there would have been no error in admitting the testimony of the actuary." Perhaps the best way to state defendant's position is to quote the following from its brief:

"* * * Plaintiff could not have introduced in evidence larger figures by the actuary than he did if plaintiff had suffered the loss of both arms, both legs and both eyes. Plaintiff's attorneys were permitted to try this case from the beginning to the end on the same basis as if plaintiff had suffered such injuries.

"Plaintiff had not earned any money since he quit work in April, 1955. But there is no evidence that he could not earn money. There is no evidence that he ever applied for other work. There is no evidence at all that he could not have obtained satisfactory remunerative employment, and the court cannot take judicial knowledge of the falsity that an otherwise able-bodied man 54 years of age cannot obtain today in Jefferson County, Alabama, reasonably remunerative employment even though he has sustained a fifty per cent loss of use of his right wrist and hand and even though he is not an educated man. * * * To permit a plaintiff to recover damages for loss of earnings that he could earn but doesn't is to put a penalty on diligence and a premium on sloth.

"The only excuse that plaintiff or plaintiff's counsel offered for plaintiff's failure to obtain other remunerative employment was that if he did so and made more than $100.00 per month he would lose his pension of $127.50. That is plaintiff's business and he has the right to take that attitude in the matter, but by doing so this defendant should not be penalized.

*    *    *    *    *    *

"If plaintiff's counsel had taken the position or had acknowledged, or if the court had ever made it clear to the jury, that the plaintiff was not totally disabled, that he had not suffered a complete destruction of earning capacity, the error committed by the court in allowing this false premise to serve as a spring board for the evidence of the actuary would not have been as prejudicial to the defendant; but never was that done, and it clearly appears in view of the ruling of the court and the circumstances of the trial as a whole that by permitting such testimony the court held in effect that there was evidence to sustain a jury's finding that plaintiff's earning capacity had been completely destroyed.

*    *    *    *    *    *

"This Court and other courts have held that if one has sustained a permanent disability the jury may conclude that his earning capacity is impaired even though actually he is receiving the same wages or more than he was receiving at the time of his injury and it is in accordance with this holding that the courts have also held that under some circumstances a plaintiff would be entitled to recover for loss of earning capacity at the percentage of the present value of future earnings which is equal to the

percentage of his disability, but they do not go further. * * * "

We think it clear that there is no evidence of plaintiff's total permanent disability nor of total and permanent impairment of his earning capacity. On the other hand, it is equally clear. that he has suffered at least a partial permanent disability from which the jury could reasonably find that. there has resulted a permanent impairment of earning capacity to some degree. The question, then, is whether it was prejudicial and reversible error to admit in evidence the actuary's testimony based on figures relating to total incapacity when there is evidence supportive of partial incapacity only and no evidence of any specific percentage of overall impairment of plaintiff's earning capacity.

■ We are in accord with the view expressed by defendant that the trial court should carefully instruct the jury concerning the use of such actuarial figures. However, it seems to us, from a consideration of the entire record, including the trial court's oral charge and the actuary's testimony on cross-examination, that the jury was sufficiently informed as to the use of such testimony. We quote the following from the oral charge:

"* * * Now, you have heard some discussion and testimony about the figures that were put on the board as a result of the testimony of the Actuary. Now, another item of damage in a case of this kind, if you are reasonably satisfied that such injury exists, would be compensation for a permanent impairment of the plaintiff's power or capacity to earn money in the future. It is for you to pass on that and it is for you to say whether his earning capacity will be impaired in the future and if so, to what extent. I don't mean to suggest one way or the other about that. That is solely for you to pass on that, but if you should be reasonably satisfied that his earning capacity will be permanently impaired in the future, then you would be authorized to award in your verdict in this case an amount to compensate him for the loss of earnings in the future. Now, if you could compute what· those earnings would be and if you awarded a lump sum for that amount today you would be overpaying the plaintiff because that would not be earned except through a period of months or period of years and so, your problem there would be to find the present value of whatever impairment of his earning capacity might be in the future if you find there is such an impairment, and that is the reason for this testimony by the Actuary. Now, the testimony of the Actuary is admitted simply for whatever benefit it might give to the jury. It is not binding on you and it is not conclusive and you are not bound to accept the testimony one way or the other. The figures on the board are not binding on you. It is for you to say, first of all, whether or not his earning capacity will be impaired in the future and then it is for you to say what is the present value of any impairment of his earning capacity. It would be for you to consider all the evidence in the case and for you to try to reach a proper answer to that question.

"You would consider under the testimony here—and I mention this in explanation of the figures written on the board—you have heard testimony about the mortality tables, the life expectancy. Of course, those figures are not binding on you. Common knowledge and common sense tells you that a person might live beyond the ordinary expected span of life or he might not live that long. Those figures are simply given to you for whatever aid or benefit you might derive from them and the same thing applies to the other figures about his earnings or his probable earnings in

the future. It is for you to say, if you find that his earning capacity has been permanently impaired, it is for you to say to what extent the impairment is and then if these computations by the Actuary give you any benefit or aid, then you use those in determining what would be the present value of any loss of earnings in the future which the plaintiff might suffer as a result of a permanent impairment of his earning capacity."

The following is from the cross-examination of the actuary:

"Q. Now, so far as this figure of $375 per month, you could use any figure there and apply the same formula, could you not? A. Yes, sir.

"Q. In other words, it doesn't have to be—you could take ten per cent of $375 a month and make it $37.50 a month and what would happen would be that you would have $6,139, wouldn't you? A. Yes.

"Q. And you would have $6,006 here, wouldn't you? A. Yes.

"Q. And $5,687 here? A. Yes.

"Q. And $5,479 here? A. Yes, sir.

"Q. And $5,284 there? A. Yes, sir.

"Q. Or you could go to any multiple of ten or one and reduce it the same way, isn't that right? A. Yes, sir.

"Q. Or $1.00 a month would be $61, wouldn't it? A. Not exactly, no, sir. You would have to divide by $37.50.

"Q. Yes, that's right. $3.75. In other words, it is very easy to apply this to any given sum of money? A. Any monthly income.

"Q. $37.50 would be one-tenth of that? A. Yes.

"Q. Five per cent of it would be half of that figure, wouldn't it? A. Yes."

It seems to us it was a matter for the jury, in the first place, to determine from the evidence the extent of impairment of plaintiff's earning capacity in the future. After making such determination there would then be a basis for the jury to apply such percentage of incapacity to the figures given by the actuary. In view of the circumstances here, particularly the trial court's oral charge, we do not think it can be said that the actuary's testimony was prejudicial to the defendant. This court dealt with a similar problem in two fairly recent cases, viz.: Louisville & N. R. Co. v. Steel, 257 Ala. 474, 480, 481, 59 So. 2d 664; Alabama Great Southern R. Co. v. Gambrell, 262 Ala. 290, 297, 78 So.2d 619.

From the Steel case is the following [257 Ala. 474, 59 So.2d 669]:

"There are assignments of error based upon the overruling by the court of objections to a number of questions propounded to the actuary with reference to the amount of money invested at various rates of interest which would produce an income of $100 per month during the life expectancy of 22.01 years of the plaintiff, as shown by the testimony of the actuary, so that at the end of the life expectancy the entire principal and earned interest would be consumed at the rate of $100 per month over the period of the life expectancy. The figures given by the actuary in his replies are based upon an income of $100 per month. According to the actuary if the calculations are on a basis of an income of $200 per month, each figure would be twice as great and if the monthly income was $50 per month, the figures would be divided by two. Other monthly incomes would be proportionate. In other words the basis of a pecuniary loss of $100 per month was

used so that it could be easily increased or decreased depending on the jury's finding of the extent of the plaintiff's loss of earning power. At the time he was injured the plaintiff was earning about $200 per month.

"One of the elements of damages recoverable by the plaintiff under the Federal Employers' Liability Act is the loss or impairment of plaintiff's earning power. *The admissibility of mortality tables showing plaintiff's life expectancy and the admissibility of expert testimony to show the present value of any loss sustained is recognized.* This court has held that where there is evidence from which there is a reasonable inference that a plaintiff's injuries are permanent, the mortality tables are admissible. Southern R. Co. v. Cunningham, 152 Ala. 147, 44 So. 658. * * * The fact that the plaintiff worked for appellant for several months prior to the trial of the case was merely evidence to be considered by the jury in determining whether or not his earning power had been impaired by the accident. * * *

"Tendencies of the evidence showed that the plaintiff had sustained a permanent injury. Under the Federal Employers' Liability Act the question as to whether the employee's injuries are permanent is generally a question for the jury and the extent of damages in such an action is peculiarly one of fact for the jury. Shelton v. Thomson, 7 Cir., 157 F.2d 709; Hannigan v. Elgin, J. & E. R. Co., 337 Ill.App. 538, 86 N.E.2d 388." [Emphasis supplied.]

In the Gambrell case we had this to say [262 Ala. 290, 78 So.2d 624]:

"In Southern Railway Co. v. Peters, 194 Ala. 94, 69 So. 611, it was expressly held that an injured employee suing under the Federal Employers' Liability Act for personal injury is entitled to recover diminished earning capacity. See also Hines v. Wimbish, 204 Ala. 350, 85 So. 765. In Bankers' Mortg. Bond Co. v. Sproull, 220 Ala. 245, 124 So. 907, which was an action in tort, it was said that the plaintiff may recover for the impairment of his earning capacity in estimating the amount of an award for prospective damages due to impaired earning capacity. It is proper to consider plaintiff's expectancy of life and the present value of his yearly income equivalent to the probable reduction of plaintiff's earnings. 25 C.J.S. Damages § 87, p. 626. We call attention to the following cases which hold that mortality tables are admissible in evidence in an action for damages in connection with evidence tending to show decreased earning capacity on the question of probable life expectancy where the injury is permanent. Louisville & Nashville R. Co. v. Carter, 195 Ala. 382, 70 So. 655 [Ann.Cas.1917E 292]; Birmingham R. Light & Power Co. v. Wright, 153 Ala. 99, 44 So. 1037; 15 Am.Jur. 779."

### III.

The defendant excepted to the following portion of the court's oral charge, viz.:

"Of course, I have indicated during the trial of the case you are trying this case alone on the basis of the evidence and on the basis of the law produced here and you are not trying the case on the basis of whether he is entitled to some other type of remuneration, pension or otherwise, but you are supposed to be guided by the evidence here and determine whether or not he is entitled to a verdict for compensation in this case, and if so, to what extent, and the question of whether he is drawing a pension or retirement, that should not be taken in connection with your determination of the amount of your verdict here in the sense that you would reduce

the amount of any verdict that you might render here by the amount of any retirement benefits or the amount of any pension he might otherwise receive. You would not be authorized to just deduct that from it."

■ There was injected into the case the fact that plaintiff was receiving $127.62 per month under the Railroad Retirement Act. It seems to be conceded by both parties that such evidence had no place in the trial. And it further appears that both parties contributed to this situation. It seems to us that this portion of the court's oral charge was an effort to clear up for the jury any confusion which might have resulted from such testimony. We see no reversible error in this portion of the oral charge.

## IV.

■ Error is assigned in refusing to give defendant's requested charges Nos. 14, 21 and 22. Requested charge No. 14 is as follows:

"14. The court charges the jury that if any one of your number is not reasonably satisfied from the evidence that plaintiff is entitled to recover you cannot find a verdict for the plaintiff."

Requested charges Nos. 21 and 22 are to the same effect. These charges are what are sometimes referred to as "single juror" charges. Their refusal was not reversible error. Code 1940, Tit. 7, § 273; City of Birmingham v. Bowen, 254 Ala. 41, 45–46, 47 So.2d 174; City of Bessemer v. Clowdus, 261 Ala. 388, 395, 74 So.2d 259.

From what we have said it follows that the judgment appealed from is due to be affirmed. It is so ordered.

Affirmed.

All the Justices concur.