The defendant, Illinois Central Gulf Railroad Company ("I.C.G."), appeals from a jury verdict in favor of the plaintiff, Phillip J. Russell, that awarded $325,000 in damages, which included damages for loss of future earning capacity. This action was brought under the Federal Employers' Liability Act ("F.E.L.A."), 45 U.S.C. § 51 et seq. We affirm.
The issues are whether the trial court erred in submitting the issue of loss of earning capacity to the jury, and whether the trial court erred in allowing Russell's lawyer to argue to the jury the loss of earning capacity in the context of, and in the same proportional amount as, Russell's physical disability rating.
Russell was employed by I.C.G. as a brakeman. In February 1985, Russell injured his back when he slipped and fell on an icy walkway as he was walking from the train to the yard office. Russell was treated at a local hospital and released a few hours later. Over the next six weeks, he received conservative treatment from his family physician for what was thought to be a bruised or strained hip. He was off work for two months. Russell returned to work, but continued to have problems with his lower back. He received treatment periodically from his family physician and an orthopedist. In September 1985, he went on "light duty" and later saw another orthopedic surgeon for a second opinion regarding back surgery. In October 1985, he underwent surgery for a herniated disk in his lower back, at the L-5 S-1 level. Russell did not return to work as a brakeman until January 1987. The orthopedic surgeon gave him an anatomical disability rating of 12% to the body as a whole. After returning to work, and up to the trial in March 1988, he worked six or seven days a week. He was able to perform his duties as a brakeman, but complained about pain. Russell took non-prescription medicine for pain while on the job and wore a transcutaneous nerve stimulator unit on his back. His regular duties as a brakeman included a significant amount of physical activity. The jolting, bouncing, and vibration incurred *Page 962 
while riding the train aggravated his back pain. He had a life expectancy of 31.8 years and a work life expectancy of 18.13 years. Russell earned $41,734.00 in 1987, which was $3,448.00 more than he had earned in 1984, the last full year he worked before the injury. He was still employed full-time by I.C.G. at the time of the trial.
At trial, the jury heard the deposition testimony of Russell's family physician concerning his treatment of Russell's back injury. He treated Russell for pain in his lower back and prescribed pain medication. The family physician's testimony established that Russell had a serious back problem that needed the attention of an orthopedist. He sent Russell to see two orthopedic surgeons, both of whom later recommended that he undergo back surgery for a herniated disk. He allowed Russell to return to work on light duty, which meant he could do no bending or heavy lifting.
The first orthopedic surgeon testified that he examined Russell and found that he had only 30% of normal forward flexibility; very little lateral bending and rotational twist in the lower back; acute tenderness and pain in the lower back; and muscle spasms. He treated Russell conservatively and prescribed pain medication; a muscle relaxant; anti-inflammatory medication; and a lumbar corset. He allowed Russell to return to work, but told him to avoid lifting and bending. Russell still complained of pain in his lower back and extending down his right leg. Russell had X-rays and a CAT scan, from which the surgeon determined that Russell had a herniated disk, and he recommended that Russell undergo surgery.
Russell went to another orthopedic surgeon for a second opinion.
The jury heard the deposition testimony of the second orthopedic surgeon concerning Russell's back condition. His testimony was that he examined Russell in September 1985 and found that he had 60% of the normal range of motion in the lower back; normal muscle and reflexes; decreased sensation on the top of his left foot; and disk narrowing at the L-5 S-1 level. Russell also had another CAT scan, which showed a herniated disk at the L-5 S-1 level. In October 1985, Russell underwent back surgery. Over the next few months following surgery, the surgeon examined Russell and determined that his pain was relieved but that he was still having problems, which the surgeon said were consistent with arthritis. Because of the continuing problems with his back, Russell was given another CAT scan and a myelogram; the results showed that he had no other herniated disk. He gave Russell a 12% anatomical disability rating. Several months later, Russell still complained of back problems and had another CAT scan and a myelogram; the results indicated that he had a "prominent bulging of L-4, 5, and again at L-5 S-1, leaning slightly toward the right," and disk narrowing with "some degenerative changes." Three months after Russell went back to work full-time, he fit Russell with another corset and prescribed an arthritis medication. He testified that Russell could engage in normal work activities without any restrictions.
Russell went to see a neurosurgeon for further treatment upon the recommendation of the second orthopedic surgeon.
The neurosurgeon testified that Russell complained to him about back pain. He examined him and stated that, from a neurological standpoint, Russell was not disabled to do any type of work and could do anything he felt capable of doing. He testified that anyone who has been operated on has a tendency and chance to re-rupture another disk, either at the same level or the one above or below. He said that it was also possible that after surgery a herniated disk might recur with no trauma if the patient has a degenerative condition. He prescribed for Russell special exercises (the "Williams flexion exercise") to build up the muscles in his back to relieve the pain.
Russell testified that he had constant problems performing the duties of a railroad brakeman. He said that he has pain when picking up anything heavy; coupling hoses; setting handbrakes; riding in the train; or sitting or standing for long periods *Page 963 
of time. He said that, when he has the chance, he lies down while at work to relieve the pain.
Russell called an economist as an expert witness. He stated that Russell's net loss of income from February 1985 to January 1987 was $50,397, after taxes and expenses. In calculating the amount of money that Russell will earn in the future (working full-time) he considered the amount of his annualized gross wages; his work life expendency based on U.S. Department of Labor tables (18.3 years); a 2% real wage gain (the amount of wages exceeding inflation, using the consumer price index); and income taxes paid on future wages. The present value of Russell's future earnings was said to be $716,200; one percent would be $7162; five percent would be $35,810; ten percent would be $71,620.
In closing arguments, Russell's lawyer essentially argued for an award for loss of future earnings in the same percentage (12%) as Russell's anatomical disability rating and asked for $85,944 in damages for loss of future earnings. He also asked the jury for an award of $344,000 for pain and suffering during Russell's life expectancy of 31.8 years.
The jury returned a verdict in favor of Russell in the amount of $325,000. I.C.G. appealed.
I.C.G. argues that the trial court erred in submitting the issue of loss of earning capacity to the jury in the absence of any direct evidence that Russell's injuries are such as would impair his ability to earn in the future. I.C.G. argues that Russell has worked six or seven days a week for 16 months without missing any time from work due to his injury and that there was no testimony that Russell's ability to earn was impaired.
As we noted at the outset of this opinion, this is an F.E.L.A. case. This Court held in Louisville N.R.R. v. Steel,257 Ala. 474, 481, 59 So.2d 664 (1952), that, "Under the Federal Employers' Liability Act the question as to whether the employee's injuries are permanent is generally a question for the jury and the extent of damages in such an action is peculiarly one of fact for the jury."
In Carnival Cruise Lines, Inc. v. Snoddy, 457 So.2d 379, 383
(Ala. 1984), this Court held that, "Except in extreme and obvious cases, some direct evidence of the existence and extent of impaired earning capacity is necessary as the foundation upon which the jury may make an informed assessment of damages." I.C.G. argues that Russell's case is not extreme and obvious. In Carnival Cruise, this Court went on to say that, "The line between those cases requiring expert testimony to correlate physical impairment with impaired capacity to earn and those falling within the common knowledge and experience of lay persons is a fine one, and must be drawn on a case-by-case basis. . . . Where the fact sought to be proven is fairly and reasonably inferable from competent evidence adduced at trial, and that inference lies within the common knowledge of the fact finder, then that evidence is admissible without the aid of expert testimony." Id.; see Southern Ry v. Stallings, 268 Ala. 463, 107 So.2d 873 (1958). We have reviewed the evidence and have determined that the facts sought to be proven are fairly and reasonably inferable from competent evidence adduced at trial and that the inferences lie within the common knowledge of the jury in this case.
This Court held in Southern Ry. v. Stallings, supra,268 Ala. at 469-70, 107 So.2d at 879 (an F.E.L.A. case) that, "Although there is no evidence specifically defining the extent of plaintiff's overall incapacity to engage in gainful work, it nevertheless [is] a question for the jury, in their fair and enlightened discretion, to fix the amount of damages for impairment of earning capacity. . . . As to impaired earning capacity, like mental and physical pain, mutilation, disfigurement, or loss of an organ, it is shown to be difficult to furnish a standard for measurement, and the amount is to be fixed by the jury in their fair and enlightened discretion." We find the record to be replete with logical inferences that Russell could well lose future earnings as a result of his back injury. Therefore, we hold that *Page 964 
it was not error, in this case, for the trial court to submit the issue of loss of earning capacity to the jury without expert testimony establishing Russell's loss of earning capacity.
I.C.G. argues that it was error for the trial court to allow Russell's lawyer to argue, in his closing argument, that, in essence, Russell's loss of earning capacity was the same amount as Russell's 12% anatomical disability rating. It cannot be clearly shown by I.C.G. that the jury was influenced by this argument, because the jury obviously did not calculate the damages in the same manner that Russell's lawyer suggested in his closing argument. The jury's verdict was for $325,000, which was considerably less than the amount of damages requested in the closing argument ($85,944 for future earnings, plus $344,000 for pain and suffering). This Court said inSouthern Ry. v. Stallings, supra, 268 Ala. at 473,107 So.2d at 883, that, "it [is] a matter for the jury, in the first place, to determine from the evidence the extent of impairment of plaintiff's earning capacity in the future. After making such determination there would then be a basis for the jury to apply such percentage of incapacity to the figures given by the actuary." In this case, an "economist," rather than an "actuary," testified as an expert witness as to the present value of Russell's future earnings ($716,200). Therefore, we hold that it was permissible for the jury to determine from the evidence, in its fair and enlightened discretion, Russell's loss of future earnings, and that it was not error for the trial court to allow Russell's lawyer to suggest, in his closing arguments, that 12% was a reasonable basis for calculating damages.
There was evidence from which the jury could find that Russell was disabled from doing his work as a brakeman. There was evidence from which the jury could assess Russell's damages: the loss of wages from the time of the injury to the date of trial; Russell's pain and suffering resulting from the injury, both past and future; and impairment of his earning capacity. Southern Ry. v. Stallings, supra, 268 Ala. at 469,107 So.2d at 879. In this case, the tendencies of the evidence showed that Russell had sustained a permanent injury, and we will not disturb the jury's finding as to Russell's disability and loss of future earnings. The fact that Russell has continued to work six or seven days a week for 16 months is "merely evidence to be considered by the jury in determining whether or not his earning power had been impaired by the accident." Louisville N.R.R. v. Steel, supra,257 Ala. at 481, 59 So.2d at 672.
The judgment is affirmed.
AFFIRMED.
HORNSBY, C.J., and JONES, SHORES and HOUSTON, JJ., concur.