This is a negligence action involving hearing loss, brought under the Federal Employers Liability Act ("FELA"). The plaintiff, Thomas W. Long, sued CSX Transportation, Inc., alleging that he had suffered a hearing loss by being exposed at his workplace to various machines and train engines that emitted *Page 894 
noises exceeding the levels permitted by OSHA noise standards. The case was tried before a jury, which returned a verdict in favor of Long for $1,000,000 in compensatory damages. The trial court denied CSX's motion for a new trial or a remittitur and entered a judgment on the verdict. CSX appeals. We affirm conditionally.
Thomas W. Long has been employed by CSX since 1969, with duties that have included operating various types of track maintenance equipment and acting as a foreman of track maintenance crews. Since 1983, he has been employed in a management capacity. Long claims that during his career with CSX he has been exposed to various machines that have caused him to suffer a severe high frequency sensorineural hearing loss. He claims that since at least 1982 CSX has been aware of the excessive noise levels that its equipment created, but that CSX did not allow hearing protection for its employees until 1989. In fact, CSX's rule book specifically stated: "When on or about railroad tracks, nothing must be worn about the head or neck." In 1990, CSX first provided hearing protection devices and annual testing to monitor employee hearing.
The scope of appellate review in a FELA case, as that scope of review has been set out by the United States Supreme Court, is stated in CSX Transp., Inc. v. Maynard, 667 So.2d 642
(Ala. 1995):
 "The United States Supreme Court defined the scope of judicial review of jury verdicts in FELA cases in Lavender v. Kurn, 327 U.S. 645, 653, 66 S.Ct. 740, 744, 90 L.Ed. 916 (1946):
 " 'Only when there is a complete absence of probative facts to support the conclusion reached does a reversible error appear. But where, as here, there is an evidentiary basis for the jury's verdict, the jury is free to discard or disbelieve whatever facts are inconsistent with its conclusion. And the appellate court's function is exhausted when the evidentiary basis becomes apparent, it being immaterial that the court might draw a contrary inference or feel that another conclusion is more reasonable.'
 See also Lindsey v. Louisville N.R.R., 775 F.2d 1322, 1325 (5th Cir. 1985), CSX Transportation, Inc. v. Bryant, 589 So.2d 706 (Ala. 1991)."
667 So.2d at 644.
 I.
CSX first contends that, as a matter of Federal law, Long did not comply with the three-year statute of limitations imposed by the FELA in 45 U.S.C. § 51 (1988). The statutory period of limitations begins to run " 'when the plaintiff possesses sufficient critical facts from which the injury and its cause, including its work-relatedness, should be plainly known,' " Maynard, 667 So.2d at 647, quoting Chatham v. CSXTrans., Inc., 613 So.2d 341, 344 (Ala. 1993) (quoting McCoy v.Union P.R.R., 102 Or. App. 620, 623-24, 796 P.2d 646, 648
(1990)) (citing DuBose v. Kansas City S. Ry., 729 F.2d 1026,1030 (5th Cir.), cert. denied, 469 U.S. 854,105 S.Ct. 179, 83 L.Ed.2d 113 (1984)). Thus, a cause of action under the FELA arises when a claimant is, or reasonably should be, aware of his or her injury and knows, or in the exercise of reasonable diligence should know, of facts indicating that the injury is work-related. CSX v. Maynard, supra, citing Chathamv. CSX Trans., Inc., supra, at 344.
CSX contends that Long knew no later than March 9, 1989, that he was suffering some perceptible measure of hearing loss and that the loss was work-related. Long testified that he was seen on March 9, 1989 by Dr. Charles Gary Jackson. Dr. Jackson's staff did a hearing test that they did not show to him. They then scheduled Long for more tests with Ron Sheffey, an audiologist, for March 15, 1989. On direct-examination, Long testified:
 "Q. At the time prior to going in on March 15, 1989, had anyone told you that you had noise-induced hearing loss?
"A. No, Sir.
"Q. Did you think you had a hearing loss?
"A. No."
Ron Sheffey told Long that he had a noise-induced hearing loss, and Sheffy wrote on the bottom of Long's March 15, 1989, audiogram: "Bilateral high frequency sensorineural *Page 895 
hearing was most likely noise-induced." Long testified that this was the first time he was aware that he had a hearing injury and that the injury was most likely work-related.
The trial judge concluded that there was conflicting evidence as to when Long learned or should have learned that he had a work-related hearing loss. He charged the jury as follows:
 "Any FELA claim accrued in the three-year statutory period of limitations begins to run when the plaintiff possesses sufficient critical facts from which the injury and its cause, including its work relatedness, should be plainly known. Thus, a cause of action under the FELA arises when a claimant is or reasonably should be aware of his injury and knows or in the exercise of reasonable diligence should know of facts that indicate that the cause of the injury is work-related.
 "The burden of proof is upon the plaintiff to reasonably satisfy you from the evidence that this action was commenced within three years from the date it accrued. And I charge you that this action was commenced on March the 12th of 1992."
In a FELA case, if conflicting evidence presents more than one evidentiary basis for a verdict, the jury is free to determine the evidence it considers the more credible and to base a verdict on that evidence. Brown v. Seaboard Coast LineR.R., 473 So.2d 1022, 1025 (Ala. 1985), citing Dennis v. Denver R.G.W. R.R., 375 U.S. 208, 84 S.Ct. 291, 11 L.Ed.2d 256
(1963). There was sufficient evidence to support the jury's conclusion that March 15, 1989, was the date on which Long first knew he had a noise-induced hearing loss.
 II.
CSX next contends that the trial judge erred to reversal by admitting opinion evidence from an expert witness based on hypothetical facts. The witness was Dr. Dennis Pappas, a medical doctor who specializes in ears — otology and neurotology. CSX claims that the hypothetical facts were never put in evidence or otherwise substantiated during the trial. The plaintiff says there were actually two hypothetical questions posed to Dr. Pappas at his deposition and that both were supported by the evidence adduced at the trial:
 "Q. Now, Doctor, based on the history given to you by Thomas Long of the 24 years with the railroad and based on the audiogram, the objective testing that you've done on Mr. Long, and based on both tests that you've done and based on your prior medical experience and based on the fact that there was going to be testimony at trial by Mr. Long that he operated a spiker machine, and a burr crane machine and also working on or around trains for six to eight hours, whereby that you couldn't hear a conversation within a five-foot radius of the machine due to the loudness of the mufflers and the motors or the whistles or the horns; do you have an opinion within a reasonable degree of medical certainty as to the cause of Mr. Long's hearing loss?
 "A. Yes, I feel that he received a noise-induced hearing loss.
"Q. On the job?
 "A. I can't say that it was all from the job but a percentage of it was. What percentage of it is from the job and what percentage is from other reasons, I can't say.
 "Q. It was also testimony at trial that Mr. Long had been exposed to sound levels of dba levels for four to eight hours a day in the range of 85 to 90 dba's. Would that affect your opinion to any degree?
". . . .
 "A. If the noise level was at 85 to 90, eight hours a day straight, then this is severe enough to cause damage."
The record reflects that Long had normal hearing when an audiogram was done in 1967, while he was in the Army. Long testified that he went to work on the railroad in 1969. He had various jobs, including jobs operating a hydrospiker machine, a tamper machine, a ballast regulator machine, a backhoe, and a burr crane machine. He testified that he worked from 7:00 a.m. in the morning until 4:00 p.m. in the afternoon, with a lunch break, spending an average of six to seven hours a day on the machines he operated. *Page 896 
When asked "which is the closest, six or seven?" Long responded, "I would say most of the time it would be closer to seven hours a day." Long then explained that he was part of a production gang which would have a "flagging order" for four to eight miles of track. The flagging order meant "when you got out there, nothing could come between — in that between four miles and that eight miles [sic]. You were in there, that was yours, you worked." At one point, he operated a spike-driving machine. Long testified that while working on that machine he was looking directly into the back end of a three-cylinder diesel engine. At another point he operated a tie handler, which picks up crossties. Long testified that it was not uncommon to work around tie handler mufflers that were broken off down to the manifold. Long's co-worker Terry Kerry testified to this as well. Long also operated a tamper, which picks up the tracks, along with a ballast regulator, which puts the rocks or ballast under the tracks. The tamper and ballast regulation are part of the liner system that keeps the tracks straight. The tamper machine Long operated for seven years had a V-8 engine that had two big flywheels on each side, approximately 18 inches in diameter. Long testified that the flywheels caused a high-pitched hum that would "play with your ears — making your ears have problems with them." Kerry, who has operated the same kind of machine, testified that the tamper machine "had a high-pitch ringing to it . . . and you could hear it all the time." The machine was operated with the doors and windows open. Long testified that there were times when they operated the machine eight hours straight, and that it was impossible to carry on a conversation because of the noise, even four or five feet away. The machines were not turned off, even when trains were being let through the portion of track on which the production gang was working. Leon Caffey, another co-worker, explained in his testimony that the machines are not allowed to idle, because the hydraulic systems of the machines are geared to work with the engines running "wide open." Kerry testified that the machines are operated wide open. Kerry described their riding on a work train to a jobsite. He described the sound of a train whistle or horn as "just deafening."
Long later became a foreman, but he testified that as a foreman he would frequently swap out with the machine operators, in order to give them a break. As foreman, he was around the machines the full time they were operating. From 1979 to 1983, he operated a backhoe, as well as other machines. In 1983 he was promoted to assistant road master, charged with inspecting the track and supervising the gangs as they worked on the rails. A typical day began in the office at 5:30 a.m., with a conference call for an hour and a half to two hours with the division engineer. The road master's office was situated between two road crossings. The windows of the office were approximately 20 feet from the track. On average, two or three trains would come by while he was there. These trains would start sounding their horns at one crossing and would continue to sound their horns until the front of the engine went through the last crossing on the other side of the office. Until 1990 the railroad did not permit Long to wear hearing protection.
Dr. Kent Oestenstad, an industrial hygienist and associate professor in the Department of Environmental Sciences at the University of Alabama at Birmingham, testified that he had analyzed 167 dosimeter test results made by the TechCon consulting firm for CSX and had compared the noise level findings to OSHA standards. Dr. Oestenstad found that a spike driver machine similar to the ones Long had operated gave an eight-hour time-weighted average noise exposure of 92.9 dba. This violated the OSHA maximum allowable eight-hour time-weighted average noise exposure of 90 dba. The regular ballast machines had a noise level of 96.2 to 96.6, which also violated OSHA standards. Dr. Oestenstad testified that it was his opinion that Long's 14 years of exposure to the continuous impact noise reported by TechCon for workers who performed track repairs is sufficient to cause noise-induced hearing loss.
Having reviewed the evidence adduced at the trial, we conclude that the facts assumed in the hypothetical questions were supported by the trial testimony. *Page 897 
 III.
CSX argues that Long failed to produce sufficient evidence that CSX had negligently caused him to suffer hearing loss. The standard for establishing liability in FELA cases was set forth in CSX Transp. v. Maynard, supra:
 " 'In order to establish liability under the FELA, the employee must submit sufficient evidence from which the jury could reasonably infer that the employer was negligent. Additionally, there must be sufficient evidence from which the jury could reasonably infer that the employer's negligence was the cause of the claimed injury or death. Rogers v. Missouri Pacific R.R., 352 U.S. 500, 77 S.Ct. 443, 1 L.Ed.2d 493, (1957). . . .' "
667 So.2d at 644 (quoting Carlew v. Burlington N.R.R.,514 So.2d 899, 901 (Ala. 1987)).
The record reflects that Long presented sufficient evidence for the jury to reasonably infer that Long had sustained a hearing loss as a result of his years of exposure to the CSX train horns and machinery and that CSX had negligently failed to provide ear protection or warnings to its workers to avoid the noise exposure. Long and two co-workers who had worked with him gave testimony describing the nature and intensity of the noise experienced by Long. Dr. Kent Oestenstad gave testimony concerning the noise produced by the machines on which Long worked. He had conducted noise-level tests on machines similar to those that Long had worked on and obtained noise-level readings specific to Long. Dr. Ostenstad's report of the noise-level readings gave the dba readings for all of the machines to which Long had been exposed during his work with the railroad.
Dr. Dennis Pappas testified by deposition that, based upon the audiogram his office staff took of Long's right ear on March 2, 1993, he could say with reasonable certainty that Long had a configuration that was typical of damage from noise. In the SRT (sound reception threshold test), in which words are spoken and the person being tested is asked to repeat the words he hears, Long could repeat correctly only 28% of the words spoken into his right ear. Dr. Pappas testified that a person hearing well should get a score near 100%. Dr. Pappas testified: "He [Long] hears 40%. He's lost — he's missing 60%. In other words, if you give him 10 words, he only gets 4 of them. He's missing 6 words out of 10 in a sentence without a hearing aid." Since surgery for an acoustic neuroma in his left ear, Long has no hearing in that ear at all. He does not contend that this tumor was caused by environmental noise.
A jury could reasonably infer from the testimony of Long and his co-workers, from the expert testimony of Dr. Pappas and Dr. Oestenstad, from the evidence of Long's length of employment at CSX, and from the evidence regarding the noise generated by the kinds of machines Long operated without any hearing protection, that Long's hearing loss was caused by CSX's negligence. As this Court stated in Maynard, "If there is an evidentiary basis for the jury's verdict, this Court is not at liberty to draw a contrary conclusion. Lavender [v. Kurn],327 U.S. 645, 66 S.Ct. 740 [90 L.Ed. 916 (1946)]." 667 So.2d at 645.
 IV.
CSX next contends that the trial court erred in instructing the jury that it could award the plaintiff monetary damages for loss of future earning capacity. While conceding that the "loss of future earning capacity" is a permissible category of compensatory damages in a FELA case, citing Sinclair v. LongIsland R.R., 985 F.2d 74 (2d Cir. 1993), CSX argues that the plaintiff failed to prove by substantial evidence both the existence of a loss and the extent of that loss. In CarnivalCruise Lines, Inc. v. Snoddy, 457 So.2d 379, 382-83 (Ala. 1984), this Court held that, "Except in extreme and obvious cases, some direct evidence of the existence and extent of impaired earning capacity is necessary as the foundation upon which the jury may make an informed assessment of damages." CSX argues that Long's case is not extreme and obvious. We disagree.
This Court has said, "A complaint alleging permanent injury is sufficient to imply impairment of earning capacity."CSX v. *Page 898 Maynard, supra, at 647, quoting Bishop v. Poore, 475 So.2d 486,488 (Ala. 1985), citing Birmingham Electric Co. v. Cleveland,216 Ala. 455, 113 So. 403 (1927). "As to impaired earning capacity, like mental and physical pain, mutilation, disfigurement, or loss of an organ, it is shown to be difficult to furnish a standard for measurement, and the amount is to be fixed by the jury in their fair and enlightened discretion."Illinois C.G.R.R. v. Russell, 551 So.2d 960, 963 (Ala. 1989), quoting Southern Ry. v. Stallings, 268 Ala. 463, 469-70,107 So.2d 873, 879 (1958).
The record is replete with evidence that would support logical inferences that Long could well lose future earnings as a result of his hearing loss, and the common knowledge of the jury would allow the jurors to draw those inferences in this case. Id. at 963. Long testified that his job at CSX is under constant review and that "there is no way" he could maintain his salary of $50,000 per year if he lost his CSX job. His education and prior work experience, coupled with his hearing loss, make him virtually unemployable in the open labor market. The trial court did not err in instructing the jury that it could award Long monetary damages for loss of future earning capacity.
 V.
CSX argues that the trial court should have ordered a remittitur, because under the FELA a plaintiff is not entitled to punitive damages. The plaintiff responds with the argument that the jury's general verdict for compensatory damages clearly falls within the range of compensatory damages for the type of permanent injury the plaintiff incurred.
The trial court properly instructed the jury that they could not award punitive damages:
 "Damages recoverable under the FELA are compensatory. You may not include in any award to the plaintiff any amount for the purpose of punishing the defendant or serving as an example to others. Such damages would be punitive and they are not authorized under the FELA."
The question of the extent of damages is one of fact for the jury:
 " 'Under the Federal Employers' Liability Act the question as to whether the employee's injuries are permanent is generally a question for the jury and the extent of damages in such an action is peculiarly one of fact for the jury.' "
Illinois C.G.R.R. v. Russell, 551 So.2d 960, 963 (Ala. 1989), quoting Louisville N.R.R. v. Steel, 257 Ala. 474, 481,59 So.2d 664 (1952). "The general rule is that a jury verdict is presumed correct and will not be set aside on grounds of excessiveness or inadequacy unless the amount is so excessive or inadequate as to affirmatively indicate that the verdict was the result of passion, bias, prejudice, or improper motive.Spears v. Bishop, 339 So.2d 75 (Ala.Civ.App. 1976)." Brown v.Seaboard C.L.R.R., 473 So.2d 1022, 1025 (Ala. 1985).
We have carefully examined the record. CSX argues that it did not cause Long to totally lose his hearing in his left ear. Long had an acoustic neuroma in his left ear; the surgery to remove it caused him to lose all hearing in that ear. However, the tumor did not cause all of the hearing loss Long had experienced in his left ear before he had the surgery. That loss was caused by the noise exposure on his job.
There was testimony concerning the stress and problems caused by Long's hearing loss, both on the job and in his relationship within his family. Long testified to difficulty in hearing radio and telephone instructions on the job. He stated that he fears missing a communication and causing a problem, or at worst, a death. His job is always being reviewed by his supervisors. Co-worker Kerry testified about mistakes Long has made on the job because of his poor hearing.
Long testified that he does not watch television or go to the movies, because he cannot understand what is going on. He further testified that his wife has to act as an interpreter when he tries to talk with his two young daughters and that this creates a strain in his family. His wife also testified about the strain placed on the family by Long's hearing loss. Dr. Pappas stated that Long will continue to have difficulty hearing *Page 899 
the voices of females, because female voices tend to be of a higher frequency than male voices and noise-induced hearing loss is a loss of the ability to hear high-frequency sounds.
This Court, when it concludes that a judgment is excessive, has the authority under § 12-22-71, Ala. Code 1975, subject to certain state constitutional constraints, to determine the proper amount of a recovery and to affirm the judgment subject to the plaintiff's filing a remittitur of the amount in excess of the proper amount. Sears, Roebuck Co. v. Harris,630 So.2d 1018, 1033 (Ala. 1993). A jury verdict may not be set aside or a remittitur ordered unless the verdict is flawed and thus without constitutional protection. Id., citing Hammond v. Cityof Gadsden, 493 So.2d 1374, 1378 (Ala. 1986).
Although the plaintiff suffered a permanent hearing loss, he has been able to retain his employment. We have reviewed the verdicts of other hearing-loss cases involving railroad employees,[1] and we conclude that Long's compensatory damages award is excessive. We order a remittitur of the $1,000,000 in compensatory damages to $500,000.
The judgment is affirmed, conditioned upon the plaintiff's filing a remittitur, as indicated above. The plaintiff shall, within 30 days after the date of this opinion, file a remittitur, pursuant to § 12-22-71, Ala. Code 1975, reducing the total judgment to $500,000; otherwise, this judgment will stand reversed and the cause remanded for a new trial.
AFFIRMED CONDITIONALLY.*
MADDOX, ALMON, HOUSTON, KENNEDY, and COOK, JJ., concur.
HOOPER, C.J., concurs in part and dissents in part.
[1] CSX v. Maynard, supra (verdict of $325,000); CSX Transp., Inc.v. Dansby, 659 So.2d 35 (Ala. 1995) (verdict of $105,000); CSXTransp., Inc. v. Bryant, 589 So.2d 706 (Ala. 1991) (verdict of $25,000).
* Note from the reporter of decisions: The Supreme Court's docket sheet indicates that on January 9, 1997, a "notice of filing for a remittitur" was filed in the trial court.